FILED
ROCK ISLAND, IL

2004 APR -1  A 9: 43

CLERK OF DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

UNITED STATES DISTRICT COURT
IN AND FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION, )            Civil Action # 3:02-cv-10109
                     Plaintiff, )
                                   )
           v.                      )     **PLAINTIFF'S STATEMENT**
                                   )     **OF UNDISPUTED MATERIAL**
DIAL CORPORATION, )     **FACTS**
                     Defendant. )
                                   )
_____ )

The following statements of fact are not disputed.  References are to the Exhibits filed with

this Motion.

1.   Dial implemented a work tolerance screening test ("WTT") in January, 2000.  Exhibit 2,

Dial Expert Report, p. 18.

2.   The WTT was designed to simulate: lifting a 35 pound rod of sausages, carrying it a

distance, and lifting/placing it at alternating "low" and "high" levels to a notched conveyer receiver,

followed by unloading the same rod and placing it at a work station.  During active work, employees

perform 1.25 lifts per minute.  Exhibit 2, Dial Expert Report, p. 19.

3. During the WTT test, the applicant spends seven minutes continuously carrying a rod with

weights totaling 35 pounds back and forth to a plywood frame with notches set at approximately 33



and 67 inches.   Successful female applicants generally perform 2.9 to 3.4 lifts per minute.

Successful male applicants generally perform 4.0 to 7.4 lifts per minute.  Exhibit 1, EEOC Expert

Report, p. 19-20.

4. The WTT was designed by an occupational therapist not employed by Dial.  Exhibit 2,

Dial Expert Report, p. 18.

5. Prior to the use of the WTT, applicants were selected using a multi-step process including a review of his/her application, a written test, a personal interview, a group problem solving exercise and final interview. Candidates who successfully completed each step of the process were made a job offer contingent on a medical examination and a drug test. Exhibit 2, Dial Expert Report, p. 18, App. B.

6. During the three year period from 1997-1999, prior to implementation of the test, Dial hired 135 entry level production operators; 71 (52.6%) were male. 64 (47.4%) were female. Exhibit 4.

7. In 1997 Dial hired 66 production operators, 32 male and 34 female. Exhibit 4, Bates ## DEF1420-DEF1424.

8. In 1998 Dial hired 19 production operators, 15 male and 4 female. Exhibit 4, Bates ## DEF 1425-1434.

9. In 1999 Dial hired 50 production operators, 24 male and 26 female. Exhibit 4, Bates ## DEF 1435-1447.

10. After January 1, 2000, the hiring process remained the same, except for the use of the WTT, which was given after the contingent job offer had been made. Exhibit 2, Dial Expert Report, p. 18; Exhibit 9, Farrington Dep., p. 20-21.

11. In the four years since the test was implemented, 2000-2003, Dial has hired 155 entry level production operators. 133 (86%) were male. 22 (14%) were female. Exhibit 5.[1]

---

[1] During discovery, Dial has produced a number of documents showing hires by gender and by year. These have not been entirely consistent; at EEOC's request Dial produced the list attached as Exhibit 5 on March 30, 2004. EEOC reserves the right to dispute the specific numbers, but accepts them for purposes of this motion. *Cf.* Exhibit 2, Dial Expert Report, Ex. 2.1, p. 24, where slightly different numbers are used. *See also,* Exhibit 3, Campion Decl., ¶¶ 9, 10; Appendix B.

12.  Since the WTT was implemented in January, 2000, 158 males have been tested.  6 (3.8%) have failed the test.  67 women have been tested.  41 (61.2%) have failed the test.  Exhibit 5.

13.  In 2000, 44 males took the work tolerance test.  2 failed the test.  40 were hired.  24 females took the test.  10 failed the test.[2]  13 were hired.    Exhibit 5.

14.  In 2001, 28 males took the test; 2 failed; 22 were hired.  14 women took the test; 11 failed; 3 were hired.  Exhibit 5.

15.    In 2002, 31 males took the test; 1 failed; 26 were hired.  13 women took the test; 12 failed; 1 was hired. Exhibit 5.

16.  In 2003, 55 males took the test; 1 failed;  45 were hired.  16 women took the test.  8 failed; 5 were hired.  Exhibit 5.

17.  Most female applicants completed the test.  Exhibit 8, Jones Dep., p. 160.

18.  The pass rate for female test takers has been less than 80% of the pass rate for male test takers in each of the four years (2000-2003) and for the four years combined.  Exhibit 1, EEOC Expert Report, p. 41.

19.  The pass rate for female test takers has been less than the pass rate for male test takers to a statistically significant degree in each of the fours years (from 4 to 6 standard deviations for each year from 2000-2003)  and for the four years combined (more than 8 standard deviations.)  Exhibit 1, EEOC Expert Report, p.41.

20.  No validation studies were conducted of the test prior to its implementation. Exhibit 2, Dial Expert Report, p. 100.

---

[2]  In 2000, the test instrument included a line for pass/fail.  In later years a job offer has been the equivalent of a pass.  Women, including Charging Party, Paula Liles, Tracy Dresden, and Charlotte McClure, are marked as passed on the test score sheets, although they are included in the numbers for failed.  They were not hired.

-3-

21. No incumbent employees, hired prior to 2000, have taken the work tolerance test. Exhibit 7, Jones dep. 147-48; Exhibit 9, Farrington dep., p 35-36.

22. Prior to 2000, there were not perceived deficiencies in job performance of sausage makers (other than the injury rate) which lead to implementation of the work tolerance test. Exhibit 7, Jones dep., p. 99.

23. The purpose of the test was to reduce injures in the sausage team operation. Exhibit 7, Jones dep., p. 26, 99.

24. Approximately 76 people are employed at any given time in sausage making. Exhibit 2, Dial Expert Report, p. 11.

25. Approximately 216 people worked in the sausage department between January 1, 2000 and mid-2002. Exhibit 1, EEOC Expert Report, Appendix E.

26. Prior to the test, Dial sausage making employees suffered injuries resulting in workers compensation costs in the following numbers: 13 in 1998; 20 in 1999. Exhibit 1, EEOC Expert Report, p. 28.

27. Following implementation of the work tolerance test, Dial's sausage-making employees suffered injuries resulting in workers compensation costs in the following numbers: 9 in 2000, 11 in 2001, 11 in 2002. Exhibit 1, EEOC Expert Report, p. 28.

28. The decrease in injuries resulting in workers compensation costs was significant only for the comparison between 1999 and 2000. It was not statistically significant from 1998 to any year after the test was implemented or from 1999 to 2001 or 2002.. Exhibit 1, EEOC Expert Report, p 27-28.

29. Prior to the test, there were OSHA recordable injuries in the sausage-making

department in the following numbers: 17 in 1998 and 16 in 1999. Exhibit 1, EEOC Expert Report, p. 29.

30. Following implementation of the work tolerance test, there were OSHA recordable injuries in the sausage-making department in the following numbers: 10 in 2000, 10 in 2001, 8 in 2002, and 8 from 1-1-2003 to 6-12-2003. Exhibit 1, EEOC Expert Report, p. 29; Ex. 7.

31. The decrease in OSHA recordable injuries was statistically significant only for the comparison between the year 1998 and the year 2002. It is not statistically significant for any other pair of years, or for the comparison between the pre-test years, 1998-1999 and the post-test years, 2000-2003. Exhibit 1, EEOC Expert Report, p. 29.

32. In 1998, 19 individuals were hired. 5 (26%) of those peoples were injured in the Smokehouse during their first two years of employment, 1998 and 1999. Ex. 3, Campion Decl., ¶6.

33. 55 people were hired in 1999. 8 (14.5%) were injured in the Smokehouse during their first two years of employment, 1999 and 2000. Ex. 3, Campion, Decl., ¶ 6.

34. 48 people were hired in 2000. 10 (20.8%) were injured in the Smokehouse during their first two years of employment, 2000 and 2001. Ex. 3, Campion Decl. ¶ 6.

35. 25 people were hired in 2001. 3 (12.0% were injured in the Smokehouse during their first two years of employment, 2001 and 2002. Exhibit 3, Campion Decl., ¶6.

36. People hired in 1998 and 1999, prior to the implementation of the work tolerance test had approximately the same likelihood of being injured (17.6%) as people hired in 2000-2001 (17.8%). Exhibit 3, Campion Decl., ¶ 5.

37. The numbers of injuries, both before and after implementation of the test, are too small for statistically significant conclusion about the impact of the test on injury rates. Exhibit 3,

Campion Decl., 12;  Exhibit 2, Dial Expert Report, p. 80; Exhibit 7, Jones Dep. p131, 134.

38.   The "statistical power" of the analyses of injury rates, which reflects the ability of these analysis to detect a medium sized effect, given the number of employees in the Smokehouse, is 85%.  This means that there is an 85% likelihood that a statistically significant drop in injuries would have been found, had there been an actual such drop.  Exhibit 3, Campion Decl., ¶ 12.

39. Prior to implementing the WTT,   Dial began a work rotation program in the sausage making unit. Exhibit 9, Farrington Dep. p. 44-45; Exhibit 7, Jones Dep., p. 27.

40.  Prior to implementing the WTT,   Dial offered lifting training to workers in the Smokehouse.  Exhibit 8, Linares Dep., p. 25-26; Exhibit 7, Jones Dep., p. 26-27; Exhibit 9, Farrington Dep., p. 44-45.

41.  In 2001, Dial provided training with a videotape called Back Injury Prevention to workers in the Smokehouse.  Exhibit 8, Linares Dep., p. 26.

42.  Dial offers yearly training in back exercises and use of a belt  to workers in the Smokehouse. Exhibit 8,  Linares Dep., p. 28.

Dated this 31st day of March 2004.

Respectfully submitted,

Jean P. Kamp
Regional Attorney

Brian C. Tyndall
Senior Trial Attorney

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION

Milwaukee District Office
310 West Wisconsin Avenue - Suite 800
Milwaukee, WI  53203-2292
(414) 297-1860