FILED
APR 27 2004
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

UNITED STATES DISTRICT COURT
IN AND FOR THE SOUTHER DISTRICT OF IOWA
DAVENPORT DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) | Civil Action # 3:02-cv-10109 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| DIAL CORPORATION, | ) ) | |
| Defendant. | ) ) | |

## EEOC RESPONSE TO
## DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

Plaintiff, the Equal Employment Opportunity Commission, pursuant to Local Rule 56.2, hereby submits the following response to Defendant's Local Rule 56.1 Statement of Material Facts in support of its motion for partial summary judgment.

**I.      The Parties, Jurisdiction and Venue.**

1.      Plaintiff is the Equal Employment Opportunity Commission ("Plaintiff" or "EEOC"), which brought this case based upon a charge of discrimination filed by Paula Liles against Dial. (Ans. to Compl. ¶¶ 3, 6). Paula Liles is not a party to this lawsuit. (Ans. to Compl. ¶ 3).

Admitted.

2.      The Dial plant at issue in this case is located in Ft. Madison, Iowa, and produces a variety of canned meat products. (Lutenegger Decl. ¶ 2).

Admitted.

3.      The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345, because Plaintiff's claims arise under the laws of the United States,

specifically, Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1991. (Ans. to Compl. ¶ 2).

Admitted.

4. Venue is proper in this District because the events giving rise to Plaintiff's claims occurred in this District. (Ans. to Compl. ¶ 2).

Admitted.

## II.  The Employment Setting At The Ft. Madison Plant.

5. New employees are hired into positions in the sausage making area and, typically, spend a number of months or more in those positions before they accrue sufficient seniority to bid on other jobs under the applicable collective bargaining contract. (Lutenegger Decl. ¶ 3).

Admitted.

6. The entry level jobs in the sausage making area are very physically demanding. (Beaird Dep. at 27; Lutenegger Decl. ¶ 4).

Admitted.

7. The employees on the Frank-A-Matic or "loading" end of the operation must lift and carry rods holding approximately 35 pounds of uncooked sausage links to a moving conveyor apparatus and place or lift the rods onto notches in the conveyor slowly rotating between the lowest notch at 39 inches and lifting the rods onto the highest notch at either 65.5 inches (EEOC's contention) or 69 inches (Dial's contention) above floor level. (Lutenegger Decl. ¶ 4).

Admitted. See also, EEOC Exhibit 11, letter from Dial to EEOC, asserting that the higher notch is 65 inches.

8. The employees in the Smokehouse or "unloading" end of the operation must lift

and carry the rods of cooked sausages from the moving conveyor from either a 61 inch or 33 inch height and carry the loaded rods approximately 15 feet to the peeler table. (Lutenegger Decl. ¶ 5).

Admitted.

### III. The Work Tolerance Test.

9. The Ft. Madison employees are represented by United Food & Commercial Workers' Union, Local 617 and consequently, the jobs in which new hires are hired into are dictated by the seniority provisions of the collective bargaining agreement. (Beaird Dep. at 4, 27-28, 45, 63, 113).

Admitted.

10. Given the physical demands of the jobs in the sausage making area, employees with seniority bid to other positions within the plant, which leaves the openings in that area for new hires. (Beaird Dep. at 27-28, 45, 63, 113).

Disputed. Many employees with higher seniority remain in the sausage making area. EEOC Exhibit 2, Dial Expert Report, p. 20-21.

11. Because of the physically demanding nature of the sausage-making jobs, there has historically been a high rate of employee injuries in that area, which has always been a concern. (Linares Dep. at 33; Beaird Dep. at 26-28, 51; Farrington Dep. at 17-18).

Disputed that the term "high" is appropriate. The historical injury rates are set forth at EEOC Facts 26-37.

12. The physical ability test, known as the "Work Tolerance Screening" ("WTS"), was implemented in 2000. (Farrington Dep. at 14).

Admitted.

13. The idea of using the WTS to test for physical ability before placing employees in the entry level sausage making jobs was conceived of by Jean Farrington, a female who was the Plant Human Resources Manager, and Martha Lutenegger, a female, who is the Plant's Occupational Health Nurse. (Lutenegger Dep. at 2, 22-24; Farrington Dep. at 14-15, 17).

Admitted.

14. Ms. Lutenegger has been Dial's Plant Nurse at the Fort Madison Plant since 1977. (Lutenegger Dep. at 3). She is a Registered Nurse and has a Bachelor's Degree in Health Arts. (Lutenegger Dep. at 17-19). She is also a Certified Occupational Health Nurse. (Lutenegger Dep. at 19).

Admitted.

15. Ms. Lutenegger was very concerned about the number of injuries occurring in the sausage making positions as a result of the significant physical demands of the job. (Farrington Dep. at 17).

Admit that Ms. Lutenegger was concerned about the number of injuries.

16. Therefore, Ms. Farrington and Ms. Lutenegger determined that a pre-screen for physical ability was necessary in order to reduce the number of injuries on the job. (Lutenegger Dep. at 22; Farrington Dep. at 14-15, 17-18).

Admit that this was their testimony. Deny that the test would reduce injuries. EEOC Facts 36.

17. Ms. Lutenegger then consulted with an occupational therapist, Molly Sichterman, at a hospital in Ft. Madison, who evaluated the requirements of the job and designed the WTS

test. (Lutenegger Dep. at 29-31, 41-42; Farrington Dep. at 14-15, 17-18, 22).

Admitted.

18. The WTS is a simulation of the job duties and physical ability required of the production workers in the sausage making area. (Lutenegger Dep. at 31, 41-42; Farrington Dep. at 17-18, 22, 54; Linares Dep. at 9).

Admit that the work tolerance test is intended to simulate the job duties of production workers in the sausage making areas. There are, however, many significant differences. Lutenegger Deposition, p. 31-34. In particular, the test is performed at a far faster pace than are actual job functions. EEOC Facts 2, 3.

19. The test has at all times been administered by female occupational therapists and Ms. Lutenegger. (Lutenegger Decl. ¶ 6; Lutenegger Dep. at 37).

Admitted.

20. The idea for a strength test was triggered by strength requirements in place at other area employers. (Lutenegger Dep. at 29).

Disputed. Ms. Lutenegger testified that an earlier strength test was modeled on language in an advertisement for the Wal-Mart Distribution Center stating the weight lifting job requirements. Lutenegger Dep, p. 29. There is no evidence that any person at Dial evaluated the effectiveness of similar strength tests used by other employers.

21. In the first year, Ms. Lutenegger made the decisions as to who passed the test; beginning in 2001 the decision was a joint decision of the occupational therapists and Ms. Lutenegger. (Lutenegger Decl. ¶ 6).

Admitted.

22.     That assessment was made based upon whether the applicant showed some difficulty in performing the WTS. (Lutenegger Decl. ¶ 7; Farrington Dep. at 109-110).

Disputed. Women who showed little or no difficulty with the test were not hired. Men who showed some difficulty in performing the test were hired. EEOC Additional Facts 13-18.

23.     Applicants are evaluated on their WTS performance based on whether they are able to complete the full seven minutes of the test, and whether they show signs of fatigue or strain which would indicate the applicant could not perform the job duties over a full shift. (Lutenegger Dep. at 39-40; Lutenegger Decl. ¶ 7).

Disputed. Many female applicants who were able to complete the full seven minutes of the test were not hired. Male applicants who showed signs of fatigue or strain were hired. EEOC Additional Facts 13-18.

24.     The decision to adopt the test, and the design of the test, were not done with the intent of discriminating against females -- it was simply a test of physical ability without regard to the sex of the applicant. (Lutenegger Dep. at 68-69; Beaird Dep at 28; Farrington Dep. at 63-64).

Disputed. EEOC Facts 6-38; EEOC Additional Facts 1-19.

25.     The WTS was created and implemented to reduce the number of injuries occurring in the sausage-making teams. (Lutenegger Dep. at 45; Farrington Dep. at 18). The purpose of the WTS is to test the ability of employees to perform the sausage-making jobs, and reduce injuries. (Lutenegger Dep. at 25, 68; Beaird Dep. at 28; Farrington Dep. at 18, 54)

Disputed that the purposes of the test is to test the ability of employees to perform the sausage making jobs. EEOC Facts 22, 23. Admitted that one of the purposes of the test was to reduce injuries.

26.     Prior to implementing the WTS, the Plant considered and implemented a number of measures in an effort to reduce the injury rate, including: (1) instituted a Plant ergonomics program; (2) implemented a rotation between the unloaders and peeler operators; (3) provided lifting education and instruction; (4) discuss means for reducing injuries in sausage-making team meetings; (5) instituted an exercise program; (6) adapted a work hardening program before requiring employees to work a full day on sausage-making teams; (7) provided protective back belts to employees; (8) showed employees back injury prevention videos; and (9) implemented incentive plans to promote safety (such as free meals for injury free work hours). (Lutenegger Dep. at 27, 44, 46, 53-54, 95; Linares Dep. at 16-17, 19-20, 23-24, 34, 41, 51, 65; Beaird Dep. at 51-53; Farrington Dep. at 40-42).

Admitted that Dial has implemented measures to reduce the injury rates. Deny that these measures were implemented prior to implementing the work tolerance test. EEOC Exhibit 12, Dial Answer to Interrogatory 11.

27.     Despite these efforts prior to the WTS, injury rates continued to rise. (Beaird Dep. at 57-58; Farrington Dep. at 40, 49).

Disputed. EEOC Fact 29.

**IV.     The EEOC's Claims of Discrimination.**

28.     The Iowa Civil Rights Commission found no evidence of discrimination in the Plant's use of the WTS, and administratively closed Liles' charge. (Def.'s Facts Ex. 3).

Object to materiality.

29.     There is no indication that gender played any role in either the hiring process or the implementation and administration of the WTS. (Lutenegger Dep. at 39-40, 45, 57-58, 68-

-7-

69).

Disputed. There is both statistical and anecdotal evidence that gender played a role in both the hiring process and in the implementation and administration of the WTS after January 1, 2000.

30. Throughout the EEOC's investigation into the underlying charge, it was at all times Dial's understanding that the only issue was whether the EEOC could establish a disparate impact claim. (Def.'s Facts Ex. 4).

Disputed. Dial's understanding of the investigation is not relevant. In any event, Dial argued in its position statement to EEOC of August 29, 2001, Dial denied intentional discrimination. EEOC Exhibit 11.

31. In the EEOC's letter of determination of probable cause on the underlying charge, there was no evidence cited to support a claim of intentional discrimination. (Def.'s Facts Ex. 5).

Disputed. The evidence was not specified, but was cited, "...relevant, available witnesses were interviewed, and relevant documents were reviewed...." Dial Exhibit 5. Dispute as to materiality.

Respectfully submitted,

Jean P. Kamp

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Milwaukee District Office
310 West Wisconsin Avenue - Suite 800
Milwaukee, WI 53203-2292
(414) 297-1860