FILED
ROCK ISLAND, IL

04 AUG -2 PM 3: 26

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### EASTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 3-02-CV-10109 |
| v. | ) ) | Judge Longstaff |
| THE DIAL CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

### DEFENDANT'S TRIAL BRIEF

Michael A. Warner
Christopher L. Casazza
SEYFARTH SHAW LLP
55 East Monroe Street, Suite 4200
Chicago, Illinois 60603
Telephone: (312) 346-8000
Facsimile: (312) 269-8869

John A. Kuhl
STANLEY, LANDE & HUNTER
900 U. S. Bank Center
201 West Second Street
Davenport, Iowa 52801
Telephone: (563) 324-1000
Facsimile: (563) 326-6266

52

CH1 10701985.1

Table of Contents

|  | Page |
|---|---:|
| NATURE OF THE CASE | 1 |
| FACTS TO BE ESTABLISHED AT TRIAL | 2 |
| THEORIES OF DEFENSE TO BE ESTABLISHED BY EVIDENCE | 4 |
| I. THE EEOC CANNOT ESTABLISH A DISPARATE IMPACT CLAIM BY A PREPONDERANCE OF THE EVIDENCE. | 4 |
|     A. The Test Is Content Valid | 6 |
|     B. Criterion-Related Evidence Shows That The Test Is Valid | 8 |
| II. THE EEOC CANNOT DEMONSTRATE BY A PREPONDERANCE OF THE EVIDENCE THAT DIAL INTENTIONALLY DISCRIMINATED AGAINST FEMALE APPLICANTS. | 10 |
|     A. Statistics Alone Do Not Establish The EEOC's Disparate Treatment Claim. | 10 |
|     B. The EEOC's Non-Statistical Evidence Does Not Establish Discriminatory Intent. | 12 |
|         i. Men Were Not Evaluated More Favorably Than Women On The WTS. | 13 |
|         ii. The Fact That Dial Has Not Changed The WTS Does Not Establish Discriminatory Intent. | 14 |
|     C. Dial Had A Legitimate, Non-Discriminatory Reason For Implementing The WTS. | 15 |
| CONCLUSION | 17 |

CH1 10701985.1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ) ) ) | |
| Plaintiff, ) | Civil Action No. 3-02-CV-10109 |
| ) v. ) | Judge Longstaff |
| THE DIAL CORPORATION, ) ) | |
| Defendant. ) ) | |

### DEFENDANT'S TRIAL BRIEF

Defendant, The Dial Corporation ("Dial" or "Defendant"), by its attorneys, hereby files this Trial Brief.

### NATURE OF THE CASE

Plaintiff Equal Employment Opportunity Commission ("EEOC") brings this lawsuit against Dial pursuant to Title VII of the Civil Rights Act of 1964, as amended in 1991. The EEOC alleges that Dial violated Title VII because:

> Dial has refused employment to Liles and to other female applicants based on a post-offer pre-employment work tolerance test, which test has a significant disparate impact against women, which has not been shown to be job related for the position of production worker, nor consistent with business necessity;
>
> Dial has intentionally discriminated against Liles and other female applicants by refusing to hire them because of their sex.

Compl. ¶ 7. Thus, the EEOC alleges both a disparate impact claim and a disparate treatment (intentional discrimination) claim.[1]

---

[1] Dial moved for partial summary judgment on the disparate treatment claim and the EEOC so moved on the disparate impact claim. Both motions were denied by the Court on July 21, 2004.

1

CH1 10701985.1

Both the EEOC's disparate impact and disparate treatment claims ultimately hinge entirely on the Ft. Madison hiring statistics from 2000 through 2003. Dial implemented the Work Tolerance Screen ("WTS") for legitimate business reasons – to reduce and prevent workplace injuries.

EEOC asserts a disparate treatment claim contending that reduction of injuries was a pretext and the real reason was a motive to discriminate on the basis of sex. EEOC asserts a disparate impact based upon the statistical evidence and a contention that Dial cannot show that the WTS is job related and consistent with business necessity. The disparate treatment case is a jury issue; the disparate impact case is for the Court to determine.

The evidence at trial will show that Dial is not liable on either the disparate impact or the disparate treatment claims.

## FACTS TO BE ESTABLISHED AT TRIAL

The Dial plant at issue in this case is located in Ft. Madison, Iowa, and produces a variety of canned meat products. The employees are represented by the United Food & Commercial Workers' Union, Local 617 and consequently, the jobs in which new hires are hired into are dictated by the seniority provisions of the collective bargaining agreement. The job in the sausage-making area are very physically demanding. The employees with seniority to bid to other positions within the Plant do so; leaving the openings in that area for new hires. Thus, new employees are hired into positions in the sausage making area and, typically, spend a number of months or more in these positions early in their employment before they accrue sufficient seniority to bid to other positions in the Plant.

CH1 10701985.1

The employees on the Frank-A-Matic or "loading" end of the sausage making operation must lift and carry rods holding approximately 35 pounds of uncooked sausage links to a moving conveyor apparatus and place or lift the rods onto notches in the conveyor that are slowly rotating between the lowest notch at 39 inches and the highest notch at 69 inches above floor level. The employees in the Smokehouse or "unloading" end of the operation must lift the rods of cooked sausages from the moving conveyor from either a 61 inch or 33 inch height and carry the loaded rods approximately 15 feet to the peeler table.

The idea of using a WTS to test for physical ability before employees are hired into the entry level sausage making jobs was conceived of by Jean Farrington, a female who was the Plant Human Resources Manager and Martha Lutenegger, a female, who is the Plant's Occupational Therapy Nurse. Ms. Lutenegger and Plant management were very concerned about the number of injuries occurring in the sausage making positions as a result of the significant physical demands of the job. Therefore, Ms. Farrington and Ms. Lutenegger determined that a pre-screen for physical ability was necessary in order to reduce the number of injuries on the job. Ms. Lutenegger then consulted with Molly Sichterman, an occupational therapist at a hospital in Ft. Madison, who evaluated the requirements of the job and designed the WTS based thereon.

The WTS has at all times been administered by female occupational therapists and Ms. Lutenegger, the Plant's nurse since 1977. Ms. Lutenegger is a Registered Nurse and has a Bachelor's Degree in Health Arts, she is also a Certified Occupational Health Nurse. In the first year, Ms. Lutenegger made the decisions as to who passed the test. Beginning in 2001, the decision was a joint decision by the occupational therapists and Ms. Lutenegger. That

assessment of whether an applicant had the physical ability to perform the sausage making positions was made without regard to the gender of the applicant, but rather was based upon whether the applicant showed some difficulty in performing the WTS.

The decision to adopt the test, and the design of the test, were not done with the intent of discriminating against females. It was simply a test of physical ability without regard to the sex of the applicant. There is no indication that gender played any role in either the hiring process or the implementation and administration of the WTS. Indeed, the only support the EEOC cites is the hiring statistics at the Plant, statistics the EEOC believes show a disparity between the numbers of men and women hired. These statistics do not establish motive. Throughout the EEOC's investigation into the underlying charge, it was at all times Dial's understanding that the only issue was whether the EEOC could establish a disparate impact claim. Even in the EEOC's letter of determination of probable cause, there was no evidence cited to support a claim of intentional discrimination or any indication that the EEOC had investigated such a claim.

## THEORIES OF DEFENSE TO BE ESTABLISHED BY EVIDENCE

### I.  The EEOC Cannot Establish A Disparate Impact Claim By A Preponderance Of The Evidence.

The disparate impact theory had its origin in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), where the Court held that Title VII prohibited not only overt discrimination but also "practices that are fair in form, but are discriminatory in operation." *Id.* at 431.[2] The Court then

---

[2] The 1991 amendments to the Civil Rights Act of 1964 allow plaintiffs bringing Title VII claims against employers alleging intentional discrimination to seek a jury trial. *See* 42 U.S.C. § 1981a(c). Disparate impact claims, however, must be decided by the court -- not a jury. *Cf. Robinson v. Metro-North Commuter Railroad Co.*, 267 F.3d 147, 158 (2nd Cir. 2001) (under Title VII, right to a jury trial only when compensatory and punitive damages are at issue). *See also* Hon. Charles R. Richey, *Manual On Employment Discrimination Law & Civil Rights Actions In*

4

set out the standard that defendants must meet to justify a facially neutral practice that has a disparate impact:

> "The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.*

The concept of test validation was then introduced in the case of *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975), in which the Court held that a test that has a disparate impact must be shown "by professionally accepted methods" to be valid – i.e., the test is predictive of, or significantly correlated with, important elements of work behavior which comprise or are related to the job or jobs for which candidates are being evaluated." *See id.* at 431. Another formulation of the standard, adopted by the Eighth Circuit, is that if a prima facie case of disparate impact is established "the employer has the burden to justify the procedure by demonstrating that it is related to safe and efficient job performance and is consistent with business necessity." *Firefighters' Institute for Racial Equality v. City of St. Louis*, 220 F.3d 898, 904 (8th Cir. 2000).

In *Dothard v. Rawlinson*, 433 U.S. 321 (1977), the defendant attempted to defend a minimum height and weight requirement against the charge that it had disparate impact upon women. The defendant contended that the criteria was related to strength but the Court held there was insufficient evidence connecting the height and weight requirements with the requisite amount of strength thought to be essential to job performance. The Court stated that "if the strength requirement is bona fide, the purpose could be achieved by adopting and validating a test for applicants that measured strength directly." *Id.* at 332.

---

*The Federal Courts* § 1:222 (2nd ed., West) (1997-2004). Thus, in this case, only the disparate treatment claim should be heard by the jury; the Court should rule on the disparate impact claim.

5

CH1 10701985.1

What the Supreme Court endorsed as the means for determining strength is precisely what Dial did in adopting the Work Tolerance Screen. Dial's experts have shown that that test is valid.

As the EEOC's expert witness, Dr. Campion, recognizes, the two most common means for validating a test are by showing content validity or by showing that the test is supported by criterion-related validity. Dr. Campion first opined in his report that there was insufficient evidence of content validity. As he defines it, content validity is an approach that "demonstrates job-relatedness by showing that the selection process is a sample or simulation of an important component of the job." EEOC Expert Report, p. 14.

Dr. Campion then opined that the criterion-related validity evidence was not sufficient to support the validity of the test. He defined criterion-related validity as an approach that shows a statistical relationship between performance on the test and performance on the job or, in this case, injuries on the job. *See* EEOC Expert Report, p. 23. Dr. Campion acknowledges that there was a significant drop in injuries following implementation of the test in 2000. *See* EEOC Expert Report, p. 26. However, he contends that an evaluation of the data is "ambiguous" and there are alternative explanations for the drop in injuries following the introduction of the test. *See* EEOC Expert Report, p. 23.

### A.     The Test Is Content Valid

Dr. Jones' and Dr. Jackson's report directly undercuts certain conclusions reached by Dr. Campion which will prevent the EEOC from establishing a disparate impact claim. Dr. Jones and Dr. Jackson conclude that the test is job related and content valid. This was based upon a comprehensive job analysis that shows that physical strength and endurance are the most critical

6

requirements for one working on the sausage making team jobs. *See* Jones Decl., ¶¶ 3-6.[3]

Dr. Jackson's review of the workplace ergonomic and exercise physiology literature shows that employers with jobs with the strength and endurance demands of the sausage team jobs use pre-screening tools like Dial's test as a method to reduce injuries. Such tools identify those who will be capable of "performing the job's physical demands, without experiencing fatigue, strain and poor body mechanics that contribute to a higher likelihood of injury." Jones Decl., ¶ 8.

Content and criterion-related validity are alternative means for validating a test. Dr. Jones states unequivocally that it is his "professional opinion that the test may be used on the basis of content validity alone, without the need for further, criterion-related validation." Jones Decl., ¶¶ 3, 26. Therefore, it is not necessary to consider the criterion validity evidence in order for Dial to prevail at trial. Under the standard in *Albemarle*, Dial has shown the test to be valid in accordance with "professionally acceptable methods" by showing that it is content valid. Indeed, in denying the EEOC's summary judgment motion, the Court seemed to conclude that the WTS is content valid. *See EEOC v. Dial Corp.*, No. 3-02-CV-10109, slip op. at 14 (S.D. Iowa July 21, 2004). Accordingly, a ruling in Dial's favor on the disparate impact claim will be necessary at the conclusion of the trial.

---

[3] Dr. Campion's principal basis for contending that the test is not content valid is because no formal job analysis in support of content validity was performed prior to implementation. EEOC Expert Report, p. 14. However, the test was designed by an occupational therapist with expertise on job injuries after observing the job and designing the test to simulate the job. No "formal validation studies" are required if the employer can otherwise show a manifest relationship to the job in question. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 998 (1988). In any event, the Jones and Jackson expert report contains a detailed job analysis that shows content validity.

### B. Criterion-Related Evidence Shows That The Test Is Valid

EEOC claimed that Dial cannot show statistically significant evidence of criterion-related validity – i.e., that the test resulted in a statistically significant reduction in injuries. In Dr. Campion's expert report, he conceded there was a reduction in injuries following the introduction of the test, but contended that once that statistical information is segmented into a smaller analysis, there is no statistically significant evidence of criterion validity. *See* Jones Decl., ¶ 11. In Dr. Jackson's and Dr. Jones' expert report, they criticize Dr. Campion's criterion-related validity analysis on several grounds. *See* Jones Decl., ¶ 12. The most significant criticism was of Dr. Campion's attempt to use statistical significance tests with very small sample sizes and the fact that new hire injuries were tracked over a short period of post-hire tenure. *See id.*

In support of the EEOC's Motion for Partial Summary Judgment, Dr. Campion produced a declaration describing an extension of his previous analysis. He stated that the declaration presents a new analysis that includes an additional year before the test was implemented and an additional year after the test was implemented. *See* Jones Decl., ¶ 23.

As a result of this new analysis, Dr. Jones was asked to review that analysis and undertake further analysis that might bear on Dr. Campion's new conclusions. It is Dr. Jones' conclusion that Dr. Campion's newest analysis "continues to be based on incorrect assumptions, a flawed methodology, and incorrect computational procedures." Jones Decl., ¶ 25. Dr. Campion's analysis was based on considering the injuries attributable to new hires in the years 1998 through 2001. In this analysis he assumed that all of those new hires worked on the sausage team for an entire year in the year they were hired and the second year after they were

8

hired. Dr. Jones states that, although the new study expands the sample size, it still contains fundamental mistakes. Most importantly, Dr. Campion fails to take account of the actual "exposure to injury" experienced by the new hires included in the analysis. Jones Decl., ¶ 28. For example, Dr. Campion assumes that all 19 employees hired in 1998 worked in the sausage team for the entire year of 1998. In fact, those hires occurred in mid-October 1998, so those employees were only exposed to the physical requirements on the sausage making team for ten (10) weeks rather than a full year. *See* Jones Decl., ¶¶ 29-31. Dr. Campion also assumed a constant size of 72 employees on the sausage making team throughout the four years he examined. In reality, the size of the workforce varied over time. Most noteworthy, in 2000 a third shift was added, resulting in an appreciable addition of employees to the sausage making team. *See* Jones Decl., ¶ 33.

Dr. Jones then proceeded to make an analysis of the new hires' actual exposure to the sausage team. In order to increase the sample size, he added data from 1997 and 2003 to the analysis. He then used data from payroll records from which he could determine every employee's number of work hours actually spent on the sausage making team from 1997 through 2003. Jones Decl., ¶ 36.

By determining the actual number of hours that all of the new hires between 1997 and 2003 worked, Dr. Jones was able to determine a number of full-time equivalent employees and compare that with the number of injuries suffered by those employees in order to calculate a rate of injury by year. This analysis showed, for example, that the 149 production operators hired prior to the implementation of the test suffered injuries in the first year of employment at a rate of 3.14 injuries per year per full-time equivalent employee. For all employees hired from 1997

through 1999 – the years prior to the test – the overall rate of injury for those three years was 1.50 injuries per year per full-time employee equivalent. *See* Jones Decl., ¶ 61.

In contrast, the injury rate for all employees hired from 2000 to 2003, the period after implementation of the test, dropped to a rate of .24 injuries per full-time employee equivalent. *See* Jones Decl., ¶ 62. In other words, the injury rate following the test dropped to one-sixth of the injury rate prior to the test (.24 ÷ 1.50). *See* Jones Decl., ¶¶ 62, 66. Dr. Jones then went through a procedure for determining the statistical significance of the post-test drop in injury rates. *See* Jones Decl., ¶¶ 67-73. Dr. Jones then concluded "it is my professional opinion that the analysis reported here shows the WTS to possess a statistical significant level of criterion-related validity." Jones Decl., ¶ 74.

Not only is the WTS content valid, which defeats the EEOC's disparate impact claim by itself, but the test is also valid based on criterion-related evidence. At trial, the EEOC will not be able to establish a disparate impact claim by a preponderance of the evidence.

## II. The EEOC Cannot Demonstrate By A Preponderance Of The Evidence That Dial Intentionally Discriminated Against Female Applicants.

### A. Statistics Alone Do Not Establish The EEOC's Disparate Treatment Claim.

In *Int'l. Brotherhood of Teamsters v. United States et al.*, 431 U.S. 324, 335, fn. 15 (1977), the Supreme Court distinguished disparate treatment from disparate impact cases, as follows:

> "Disparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical. . . . Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more

10

harshly on one group than another, and cannot be justified by business necessity. . . ."

The EEOC has no evidence that Dial's motive in implementing the WTS was to intentionally discriminate against female applicants. Thus far, the evidence focused upon by the EEOC has been the Plant's hiring statistics, which the EEOC argues show that the WTS had a disparate impact upon female applicants. Whether the relevant statistics show a disparity between the number of men hired and the number of women hired, they do not establish a *prima facie* case of disparate treatment. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805, 805 fn. 19 (1973) (statistics may be helpful in determining if a refusal to hire conforms to a pattern or practice of discrimination, but, by themselves, may not be controlling regarding hiring decisions where there are other, legitimate reasons for declining employment). *See also, EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1287 (11th Cir. 2000) (to establish a pattern or practice of discrimination, strong statistical evidence must be coupled with evidence of discriminatory intent); *Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157, 160 (2nd Cir. 1991) (statistical evidence by itself not enough to rebut specific and contradictory evidence offered by defendant); *AFSCME v. State of Washington*, 770 F.2d 1401, 1407 (9th Cir. 1985) (statistics of pay disparity between male and female employees not enough to establish inference of discriminatory motive -- must be viewed in light of corroborative evidence); *Kesler v. BASF Corp.*, 240 F.Supp. 2d 956, 961 (S.D. Iowa. 2002) (numbers do not speak to motive in disparate treatment cases).

The WTS was conceived by two women, Jean Farrington, former Plant Human Resources Manager, and Martha Lutenegger, R.N., the Plant's nurse. The idea was triggered by strength requirements in place at other area employers. The WTS was carefully created to simulate the physically demanding sausage making production positions. The WTS has always

11

been administered by women – thus, it has always been a woman who decides who passes and fails the test. This mitigates against its being created to discriminate against females.[4] *See Richter v. Hook SupeRx, Inc.*, 142 F.3d 1024, 1032 (7th Cir. 1998) (where decision-maker is also in the protected class, there is less chance decision was based on discrimination); *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (where decision-makers also in protected class, more likely they would be victims of discrimination than perpetrators of it).

The creators have explicitly stated that the WTS was *not* implemented to discriminate against women, and that gender was not a consideration in the creation of the test. The WTS was established to reduce and prevent workplace injuries at the Plant – regardless of gender. Whenever an applicant evidenced difficulty in performing the test – whether male or female – they were not hired.

The EEOC can point to no comments, no memoranda and no documents that indicate the motives behind the WTS were anything less than pure. The Iowa Civil Rights Commission dismissed Paula Liles' underlying charge, finding no evidence of discrimination. The file from the EEOC's own investigation into the charge indicates no evidence which supports the disparate treatment claims in this case or any investigation into such claims.

### B.    The EEOC's Non-Statistical Evidence Does Not Establish Discriminatory Intent.

Despite the EEOC's summary judgment discussion of why statistics alone are enough to establish a *prima facie* case of intentional discrimination in this case, it admits that it actually

---

[4] While the Court correctly noted in its decision denying Dial's summary judgment motion that this fact is not dispositive, the Court did recognize it as a significant factor. *See EEOC v. Dial Corp.*, No. 3-02-CV-10109, slip op. at 18-19 (S.D. Iowa July 21, 2004) (citing *Richter v. Hood SupRX, Inc.*, 142 F.3d 1024, 1032 (7th Cir. 1998)).

12

CH1 10701985.1

*does* need more than statistics showing a disparate impact to prove its case. *See* EEOC Brf. in Opp. to MSJ at 3. In an effort to bolster its statistics, the EEOC trotted out the arguments that men were evaluated more favorably than women on the WTS and that Dial did not revise the WTS after realizing the disparate impact it was allegedly having on female applicants. *See* EEOC Brf. in Opp. to MSJ at 4-6. None of these additional arguments establish intent, either.

      i.    **Men Were Not Evaluated More Favorably Than Women On The WTS.**

The EEOC claims that the comments recorded on the WTS result sheets by the test evaluators prove that men were evaluated preferably to women on the WTS.[5] *See* EEOC Brf. in Opp. to MSJ at 4-5. Even if, *arguendo*, the few men cited by the EEOC were evaluated favorably to the women cited by the EEOC, these sporadic incidents do not establish a *prima facie* case of a *pattern or practice* of intentional discrimination. *See EEOC v. McDonnell Douglas Corp.*, 191 F.3d 948, 951-952 (8th Cir. 1999) (evidence that some individuals may have been treated disparately was not evidence of an underlying company policy of discrimination); *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286-1287 (11th Cir. 2000) (in pattern or practice intentional discrimination cases, plaintiffs must prove that discrimination was regular policy or procedure at defendant – not just an isolated few incidents). Furthermore, it is not the fact-finder's responsibility to sit as a super-personnel department, passing judgment on all of Dial's business or hiring decisions. *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781

---

[5] In making this argument, the EEOC loses sight of its claims. This case is not about an allegedly discriminatory scoring process, rather, it is about whether the WTS was implemented to intentionally screen out female applicants. Whether some men passed whom the EEOC believes should not have is irrelevant to the issue of *why* the WTS was put in place. At most, this evidence would support a few female applicants' claims that they should have been hired and were not.

13

CH1 10701985.1

(8th Cir. 1995) (employment discrimination laws do not bestow jurisdiction upon courts to rule on whether employment actions are simply "fundamentally unfair or arbitrary.").

Whether the comments on a few applicants' WTS result sheets indicate that in a few, isolated instances, men should not have been hired is irrelevant to establishing a *prima facie* case of a pattern or practice of intentional discrimination. In any event, the testimony will establish that the contested decisions were based upon good faith determinations as to the relative capability to perform the job. Even if one might disagree with the judgments, this does not establish that the real reason was sex.

### ii. The Fact That Dial Has Not Changed The WTS Does Not Establish Discriminatory Intent.

The EEOC claims that Dial recognized that the WTS had a disparate impact on women, and did not revise the test at that point. *See* EEOC Brf. in Opp. to MSJ at 6. The EEOC argues that this somehow establishes discriminatory intent. *See* EEOC Brf. in Opp. to MSJ at 6. The EEOC misapplies the law in making this argument. It is not *per se* illegal to utilize an employment procedure merely because it has an adverse impact on a group of individuals. Under the disparate impact analysis, if the procedure at issue meets the business necessity requirement, it is legal. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 fn. 15 (1977). Dial contends the WTS meets the business necessity test, thus it is a legal procedure despite any alleged disparate impact on female applicants. Thus, Dial had no duty to change the WTS, which was successfully reducing injuries, just because it was allegedly having a more noticeable effect on female applicants than male – indeed, the Iowa Civil Rights Commission found no evidence of discrimination in the WTS.

14

Furthermore, it is well-settled that, to prove the requisite intent to establish disparate treatment, the EEOC must prove more than Dial's awareness of a disparate impact and not acting to prevent it. *See EEOC v. Consolidated Service Systems*, 989 F.2d 233, 236 (7th Cir. 1994) (knowledge of hiring disparity not the same as intent to cause or maintain it). Rather, the EEOC must prove Dial affirmatively acted for the explicit purpose of discriminating against female applicants. *See EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263,1273 (11th Cir. 2000) (not enough to show employer acted "in spite of" adverse effects on a protected group); *AFSCME v. State of Washington*, 770 F.2d 1401, (9th Cir. 1985) (citing *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (must show employer chose particular policy because of its effect on members of a protected class – not merely that it was aware of the consequences). *See also Ricketts v. City of Columbia*, 36 F.3d 775, 781 (8th Cir. 1994) ("discriminatory purpose is more than a mere 'awareness of the consequences'").[6] The EEOC's argument that Dial was aware of a disparate impact, and its failure to revise the WTS indicated discriminatory intent, does not save its disparate treatment claim from summary judgment.

### C. Dial Had A Legitimate, Non-Discriminatory Reason For Implementing The WTS.

Even if, *arguendo*, the EEOC can establish a *prima facie* case at trial, it will be rebutted by Dial's own case. Once a *prima facie* case of intentional discrimination has been established, an employer may rebut it by showing the plaintiff's proof is inaccurate or insignificant. *See*

---

[6] In *Ricketts*, the court was analyzing a § 1983 claim that a city police department had a policy of taking domestic abuse cases less seriously than other cases, and that this was caused by an intent to discriminate against women. The analysis is the same as that under an intentional discrimination in employment case, such as this, because the *Ricketts* plaintiffs had to prove that the city's policy with a disproportionate impact was *motivated by* discrimination. *See Ricketts*, 36 F.3d at 781.

15

CH1 10701985.1

*Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1287 (11th Cir. 2000); *Woodbury v. New York City Transit Authority*, 832 F.2d 764, 769 (2nd Cir. 1987). Dial can rebut any inference of discrimination with its legitimate, non-discriminatory reason for implementing the WTS -- preventing and reducing workplace injuries in the sausage making area. *See Woodbury*, 832 F.2d at 769. Given this explanation, the EEOC must prove the reason for adopting the WTS is a pretext. *See Swartzbach v. State Farm Ins. Cos.*, 968 F.Supp. 490, 494 (E.D. Mo 1997). To demonstrate pretext, the EEOC must prove that Dial's real reason for implementing the WTS was to discriminate against women, i.e., that the proffered reason is a lie. *See id.* at 494. Even if the EEOC had evidence that Dial was mistaken in its belief that the WTS would effectively reduce and prevent workplace injuries, and that the WTS was not successful at doing so, it would not be enough to establish pretext. *See id.* at 494.

There can be no doubt Dial's stated reason for the WTS is honest, and not masking intentional discrimination. The evidence in this case will establish that there was a legitimate concern about the number of injuries in the workforce. This was a particular concern to the Plant's nurse, who in concert with the female Human Resources Manager decided to implement the WTS. The test was then designed by a female occupational therapist.

It cannot be argued that reducing injuries among its workforce is not a legitimate business goal for an employer, and thus a non-discriminatory reason to take action. There is no evidence suggesting that this explanation is pretext for discriminating against female applicants.

The EEOC will not be able to establish its disparate treatment claim by a preponderance of the evidence because the EEOC cannot establish one of the essential elements of its disparate treatment claim – discriminatory motive. Further, even if, *arguendo*, the EEOC can establish a

*prima facie* case, Dial has a non-discriminatory reason for implementing the WTS that cannot be shown to be a pretext for discrimination. Judgment for Dial will be appropriate on the disparate treatment claim.

## CONCLUSION

WHEREFORE, based upon the foregoing, Defendant The Dial Corporation submits that the EEOC will not be able to establish its disparate impact or disparate treatment claims by a preponderance of the evidence at trial, and Dial will be entitled to judgment in its favor on all claims.

Respectfully submitted,

THE DIAL CORPORATION,

By _____
One of Its Attorneys

Michael A. Warner
Camille A. Olson
Christopher L. Casazza
SEYFARTH SHAW LLP
55 East Monroe Street, Suite 4200
Chicago, Illinois  60603
(312) 346-8000

John A. Kuhl
STANLEY, LANDE & HUNTER
201 West Second Street, Suite 900
Davenport, Iowa  52801
(563) 324-1000

August 2, 2004

17

CH1 10701985.1

PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause of action or to their attorneys of record herein at their respective addressees disclosed on the pleadings on __8/2__, __2004__, by:

☒ U.S. Mail  ☐ Fax
☐ Hand Delivered  ☐ Overnight Courier
☐ Federal Express  ☐ Other

Signature _Caroline Nichs_

Jean P. Kamp
Brian C. Tyndall
U.S. Equal Employment Opportunity Commission
Milwaukee District Office
310 West Wisconsin Avenue, Suite 800
Milwaukee, WI 53203-2292