FILED
ROCK ISLAND, IL

04 SEP 24 AM 9: 15

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ) ) ) Plaintiff, ) ) v. ) ) THE DIAL CORPORATION ) ) Defendant. ) ) | CIVIL ACTION NO.: 3-02-CV-10109 EEOC BRIEF IN SUPPORT OF PROPOSED FINDINGS OF FACT AND ENTRY OF JUDGMENT |

TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I. | Introduction | | 2 |
| II. | Judgment Should be Entered on the Verdict | | 3 |
| III. | Judgment Should Be Entered for EEOC on the Disparate Impact Claim | | 3 |
| | A. | The Verdict of Intentional Discrimination Compels a Judgment in Favor of EEOC on the Disparate Impact Claim After April, 2001 | 3 |
| | B. | Dial Has Not Shown that the WTS is Job Related and Consistent With Business Necessity | 4 |
| | | 1. Standards for Test Validity | 5 |
| | | 2. Dial Has Not Demonstrated Content Validity of the WTS | 7 |
| | | 3. Dial Has Not Demonstrated Criterion Validity of the WTS | 10 |
| | | 4. Dial has Not Met Its Burden of Proof | 16 |
| IV. | Injunctive Relief is Appropriate | | 17 |
| V. | Each of the Class Members is Entitled to Individual Make-Whole Relief | | 18 |
| VI. | Conclusion | | 20 |

The Equal Employment Opportunity Commission ("EEOC") respectfully submits this Memorandum in support of its Proposed Findings of Fact, submitted herewith, and requests entry of judgment on its disparate treatment and disparate impact claims.

## I.   Introduction

In this action EEOC challenges Dial's use of the Work Tolerance Screen ("WTS"), a pre-employment strength test required of new hires after they have received a conditional job offer. Virtually all men pass the test; less than 40% of female applicants pass the test. EEOC claims that use of the test violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, under both a disparate treatment theory and a disparate impact theory.

The case was tried on liability issues from August 16 through August 20, 2004. On August 23, 2004, the jury returned a verdict in favor of the EEOC on the disparate treatment claim, finding that "...Dial engage[d] in a pattern or practice of intentional discrimination against female job applicants, as submitted in Instruction 12" (Verdict, Interrogatory 1), and that "... Dial engaged in a pattern or practice of intentional discrimination against female job applicants" beginning in April, 2001 (Verdict, Interrogatory #2). EEOC now requests that the Court: 1) enter judgment on the verdict; 2) enter judgment for EEOC on the disparate impact claim based on the verdict and on the evidence at trial; 3) order that Dial cease use of the discriminatory WTS or any other selection device which has a disparate impact against female applicants and has not been shown to be job related and consistent with business necessity; and 4) order that Dial offer a production job to each female applicant whose conditional job offer was

revoked as a result of the WTS, and pay back-pay and front-pay to each such rejected applicant.

## II    Judgment Should Be Entered on the Verdict

The jury has determined that Dial's use of the WTS was intentionally discriminatory beginning in April, 2001.[1] Based on that verdict EEOC is entitled to injunctive relief as discussed below, to job offers to each female applicant rejected since April, 2001 and to back-pay and front-pay as discussed in Section IV below. EEOC understands that Dial intends to file a Motion pursuant to F.R. Civ. P. 50(b), but will not anticipate those arguments here.

## III    Judgment Should be Entered for EEOC on the Disparate Impact Claim

### A.    The Verdict of Intentional Discrimination Compels a Judgment in Favor of EEOC on the Disparate Impact Claim After April, 2001

The jury's verdict includes a finding that the WTS "had the effect of causing significantly more women than men not to be hired as production operators" (Instruction 12), and, indeed, the disparate impact of the WTS is not disputed. Dial's affirmative defense to the disparate impact claim that the WTS is job related and consistent with business necessity is precluded starting in April, 2001, when the use of the test was intentional discrimination against women. The statute specifically provides:

> A demonstration that an employment practice is required by business necessity may not be used as defense against a claim of intentional discrimination

---

[1] EEOC submits that the verdict covers women who were tested in March, 2001, but who would have been hired effective April 2, 2001. See J. Ex. 1, Introduction, p 14-15 (showing dates of tests and dates of hires for all applicants). Two women in this group, Lena Keppel and Tiffany Smith, were awarded nominal damages pursuant to an instruction which referred to the pattern and practice of intentional discrimination, Instruction 20. The jury apparently rejected Dial's argument in closing that these two should receive zero, because they had not been victims of intentional discrimination. This issue need not be decided, however, since these women are entitled to the same relief under the disparate impact claim.

3

under this title.

42 U.S.C § 2000e-2(k)(2); *cf. EEOC v. Consolidated Service Systems*, 989 F.2d 233, 236 (7th Cir. 1993)("the statute does not allow an employer to justify intentional discrimination by reference to efficiency. 42 U.S.C. § 2000e-2(k)(2).") The verdict requires an injunction against future use of the test and make-whole relief for all women rejected after April, 2001, without regard to the disparate impact claim.[2]

### B. Dial Has Not Shown the WTS To Be Job Related and Consistent with Business Necessity

EEOC also argues, in the alterative, and without reference to the jury verdict, that the evidence demonstrates that Dial's use of the WTS violates Title VII, 42 U.S.C. §2000e-2(k), because the test has a disparate impact against female applicants, and because Dial has failed to prove by a preponderance of the evidence that the test is job related and consistent with business necessity. *Firefighters' Institute for Racial Equality v. City of St. Louis*, 220 F.3d 898, 904 (8th Cir. 2000).

There is no dispute that the WTS has a disparate impact against female applicants. Since the test was implemented, 162 males have been tested; 157, or 97%, passed. 68 women have

---

[2] The verdict is, however, relevant to the disparate impact claim. Both sides argued during the trial that if the jury found that the test had been validated and/or was necessary for Dial's business, the verdict should be for Dial. Because the jury heard the evidence relating to the disparate impact claim, and because it was not instructed as to how the validity evidence related to the intentional discrimination claim, its verdict at least implies a jury finding that the test was not necessary for Dial's business. Such a finding is binding on the Court. *See, Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 556, n. 4 (jury determination of legal claims under 42 U.S.C. § 1981 would have bound district court in considering Title VII claims based on same facts). The jury's implicit rejection of the business necessity defense for the period after April 2001 would also apply to the period prior to April, 2001, since neither the test nor its impact on female applicants changed during the period.

4

been tested; only 26 (39%) passed. PFF 19-23.[3] The difference is far more than the 80% ratio at which disparate impact is presumed. *See*, 29 C.F.R. 1607.4.(D). The statistical disparities between the male and female pass rates equal ten standard deviations. *Cf. Hazelwood School Dist. v. United States*, 433 U.S. 299, 310, n. 17 (1977) (2 or 3 standards deviations will normally provide statistical significance.). The impact is particularly egregious because the test affects *only* women; virtually all men pass the test.

The parties also do not dispute that it is Dial's burden to demonstrate that the WTS is "job related and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A). "The touchstone is business necessity." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). No proof of discriminatory intent is required. *Id.* at 432.

Dial cannot meet its burden of proving business necessity. It has not introduced evidence which would refute two crucial facts in the case: women with the same qualifications as the women rejected by the WTS successfully performed the jobs in the Smokehouse prior to the implementation of the test, and the WTS did not result in fewer injuries for persons hired after the test than for persons hired before. The test cannot, therefore, be necessary for the successful performance of the job.

### 1. Standards for Test Validity

Dial has attempted to prove business necessity by demonstrating that the WTS is a "valid" test. This is an appropriate method of proof, and derives from the language in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975): "discriminatory tests are impermissible unless

---

[3] Citations in this Brief to factual material in the record are to EEOC's Proposed Findings of Fact, ("PFF") and to the citations to the record included therein.

shown, by professionally acceptable methods, to be 'predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.'"*citing, Uniform Guidelines of Employee Selection Procedures*, now codified at 29 C.F.R. § 1607.4(c). In this case Dial has argued that the test is valid under both the content validity and the criterion validity standards.

Failure to comply with the Uniform Guidelines is not itself a violation of 42 U.S.C. §2000e-2(k). However, both Dr. Campion and Dr. Jones testified that the Uniform Guidelines are relied upon by experts in the field of pre-employment testing. While failure to comply with the standards is not fatal to Dial's defense, it is relevant to the validity of the test as claimed by its experts. *See, Allen v. Entergy Corporation*, 181 F.3d 902, 905 (8th Cir. 1999)(noting that the EEOC Guidelines are "entitled to great deference" and that "[t]he EEOC Guidelines and the *Griggs* case present the same message – tests with a discriminatory impact are impermissible unless the employer demonstrates through professionally acceptable methods that the tests are job related.").

Dial does not claim that it complied with the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. §1607. It is undisputed that the test was not validated prior to its implementation, as required by the Guidelines. 29 C.F.R. §1607.15. Rather, Dial argues that Dr. Jones and Dr. Jackson have validated the test as part of their assignment as expert witnesses in this case. However, it is also not disputed that these experts have failed to comply with the Guidelines in at least one crucial respect. The Guidelines require that a validation study examine alternative tests which would have a lesser disparate impact:

> whenever a validity study is called for by these guidelines, the user should

6

> include, as part of the validity study, an investigation of suitable alternative
> methods of using the selection procedure which have as little disparate impact as
> possible, to determine the appropriateness of using or validating them in accord
> with these guidelines.

29 C.F.R. § 1607.3 (B). Neither Dial, nor its experts, have ever considered any alternative such as, for example, adjusting the passing score so that people who completed the test passed, matching the number of lists to the actual number required on the job, allowing a retest within a short time period, shortening the test, or any other possible change which could have reduced the impact of the test. PFF 49.

As discussed more fully below, Dial's experts have failed to comply with the Uniform Guidelines in a number of respects in attempting to establish content and criterion validity of the WTS. These failures substantially limit the value of their analyses.

### 2. Dial Has Not Demonstrated Content Validity of the WTS

Content validity is defined in the Uniform Guidelines as "data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated." 29 C.F.R. §1607.5 (A). It is not, however, enough for the employer to show that the test resembles the job in question, it must also show that the test is consistent with business necessity. As noted by the Third Circuit in *Lanning v. Southeastern Pennsylvania Transportation Authority ("SEPTA")*, 181 F.3d 478, 489 (3rd Cir. 1999)[4]:

---

[4] The *Lanning* decision contains a clear analysis of the history of disparate impact law from the Supreme Court's decision in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) through its decision in *Wards Cove Packing C. v. Atonio*, 490 U.S. 642 (1989), and of the impact of the Civil Rights Act of 1991 on that history. In a later decision in the same case, *Lanning v. SEPTA*, 308 F.3d 286 (3rd Cir. 2002), the court applied the definition of business necessity to find that the test at issue was valid.

>Judicial application of a standard focusing solely on whether the qualities measured by an entry level exam bear some relationship to the job in question would impermissibly write out the business necessity prong of the Act's chosen standard. With respect to a discriminatory cut-off score, the business necessity prong must be read to demand an inquiry into whether the score reflects the minimum qualifications necessary to perform successfully the job in question. *See also*, EEOC Guidelines, 29 C.F.R. § 1607.5(H)(noting that cutoff scores should "be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force.").

Dial has not shown content validity, because successful performance on the test is obviously not necessary for successful performance on the job. Female applicants, whose qualifications other than the test were identical to female employees hired before the test, were not able to perform the test to Dial's satisfaction; the similarly situated group of female employees hired before 2000 were able to successfully perform the job.

The content validity study performed by Dial's experts was not related to the stated purpose of the test, reduction of injuries. The test measures the ability to lift 35 pounds to a height of 65 inches; however, all of the incumbent employees who had not been tested had that ability. No attempt was made to determine which work behaviors, if any, contributed to injuries. No study was done of the circumstances under which injuries occurred. There was no connection demonstrated between the test and specific job behaviors which lead to injury.

The evidence at trial showed a number of reasons that lack of success on the test did not correlate with lack of success on the job. The central problem is that the way the test is scored makes it more difficult than the actual job. For example, the loader job requires 1.25 lifts per minute, while women who complete the test usually perform at least 6 lifts per minute. P.F.F. 35, 36. A current employee who has worked in the Smokehouse, Michael Kruse, testified that the job is easier than the test because the lifting is not constant; there is a break between each lift.

8

P.F.F. 37. In addition, the actual machines have cups to hold the rod of sausages so that the worker need not carefully hold and position the rods as is required by the test. Further, as shown in the video of the job being performed, and by Mr. Kruse's testimony, the job is performed at a more relaxed pace, where workers stop and talk to each other for a few seconds while performing lifts. On the job the chain comes down at an angle so that the top rung for the rod of sausages is at approximately five feet, rather than the five feet seven inches on the test. PFF 37. As Dr. Jones himself admitted at trial, it is not sufficient for content validity that the test look like the job in some respects. A typing test which requires typing 100 words per minute is not a content valid test for a job which requires typing 40 words per minute.[5] Finally, the subjective scoring of the test, where signs of fatigue or of arching the back or of standing on tiptoes are sometimes grounds for failure and sometimes not, PFF 39-42, meant that the test was unreliable even for what it purported to measure.

Part of the problem with the attempted content validation likely stems from the fact that Dial's experts did not talk to anyone who actually performed the job in preparing their descriptions of the job functions. PFF 31. Indeed, the only witness at trial who had ever worked in the Smokehouse in any capacity was Michael Kruse, who was called by EEOC. In addition, Dial's experts did not use the most obvious, standard tool for test validation. They did not make any attempt to determine whether incumbent employees who had passed the test performed better than those who had not ever taken the test; indeed, they never had any incumbent employee hired

---

[5] Interestingly, turnover rates for new hires tripled after implementation of the WTS. While the reasons for the increase (50% for the most recent hires in 2003) are not clear, one would expect a test which was correlated with important job functions to decrease, not increase, turnover rates. PFF 44, 45.

before 2000 even try the test.[6]

Despite the difficulty of the test, most applicants, whether male or female, are able to complete the full seven minutes. PFF 32. The subjective evaluation of "difficulty" in completing the test has lead to the high failure rate for women. The cut-off score for the WTS does not meet the general standards for validity studies as described in the Uniform Guidelines; it is not "reasonable and consistent with normal expectations of acceptable proficiency within the work force." 29 C.F.R. § 1607.5(H). As demonstrated by the fact that women have successfully performed the job prior to the implementation of the test, the test is not "necessary" to measure the minimum requirements for the job. *Lanning*, 181 F.3d at 489.

### 3. Dial Has Not Demonstrated Criterion Validity of the WTS

Criterion validity may be a more relevant tool for attempting to validate the WTS because of the asserted purpose of the test which is to reduce injuries in the Smokehouse. The Uniform Guidelines define criterion validity as "empirical data demonstrating that the selection procedure is predictive or significantly correlated with important elements of job performance." 29 C.F.R. §1607.5 (A). If Dial could demonstrate a statistically significant reduction in injuries by comparing people hired without taking the test to people hired after taking it, the test would meet the standards for criterion validity. While some courts have held that criterion validity is not necessary in every case to show business necessity,

---

[6] *See*, *Allen v. Entergy Corporation*, 181 F.3d at 905 (noting that in that case where a pre-employment test had been properly validated, "[p]erformance evaluations were mathematically correlated with the test results and confirmed that higher test scores indicated a likelihood of better performance."); *Lanning v. SEPTA*, 308 F.3d at 291 (test was valid where statistical evidence showed that individuals who passed the test had a success rate of 70% to 90% on various job standards, while persons who failed had success rates of 5% to 30%).

> the conceptual core of validation is criterion validation. Tests are valid if, and only if, they predict performance, although content or construct validation may be cheaper and more convenient techniques to use. Content or construct validity are simply plausible predictions that true criterion validity would in fact exist if tested for.

*Allen v. City of Chicago*, 2002 WL 31176003 *3 (N.D. Ill. 2002) *aff'd* 351 F.3d 306 (7th Cir. 2003), *quoting*, Mark Kelman, *Concepts of Discrimination in "General Ability" Job Testing*, 104 Harv. L. Rev. 1158, 1171 n. 35 (1991).[7]

In determining the business necessity for a test whose purpose is to reduce injuries, the question is whether the test has, in fact, reduced injuries. Although Dial's experts did not examine the evidence for criterion validity in their original report, they have attempted to establish criterion validity at trial. However, the evidence shows that injuries have remained constant for workers hired from 1998, two years before the test was implemented, through the present.

The underlying data relied upon by the experts was virtually the same: injury data for the years 1997-2003, Joint Exhibits 2, 3 and 4, and exposure data, belatedly produced by Dial, and admitted as Dial's Exhibits Q and R.[8] The experts generally agreed that relevant comparisons could be made using all injuries which occurred in the Smokehouse, strength related injuries, OSHA recordable injuries and workers compensation cost injuries. PFF 51. All injuries

---

[7] Professor Kelman's article is an illuminating discussion of the theoretical basis for disparate impact law.

[8] Exhibit Q is the weekly time record of individuals employed in the Smokehouse. Exhibit R is the same information in annual form. Because of the length of Dial Exhibit Q, it is not included in the attached Appendix.

11

provided the largest sample[9]; strength related injury rates are more likely to have been affected by the WTS, which is a strength test; workers compensation cost injuries are those which resulted in a dollar cost to the company, often because of lost time, and/or OSHA recordable injuries are those serious enough to be required to be reported under the federal Occupational Health and Safety Act. The experts also agreed that the most relevant comparison groups were individuals hired in the years before the test compared to individuals hired in the years after the test, with the data adjusted for exposure time, the number of hours actually spent by each group working in the Smokehouse. PFF 68.

The evidence showed the following:

a     The overall number of injuries was small both before and after the test. The total number of injuries for persons hired in 1998 during their hire year and the two following years was 6; for persons hired in 1999 was 16; for persons hired in 2000, after the WTS test, was 16; for persons hired in 2001 was 3, and for persons hired in 2002[10] was 4. EEOC Ex. 30

b.     The number of strength related injuries was even smaller: for the same groups during their first three years, the numbers of injuries were 3 for 1998 hires, 10 for 1999 hires; 10 for 2000 hires; 3 for 2001 hires, and 1 for 2002 hires. EEOC Ex. 31.

c.     The number of strength related workers compensation cost injuries for the same groups during their first three years of employment were 1 for 1998 hires; 3 for 1999 hires; 3 for 2000 hires; 3 for 2001 hires and 1 for 2002 hires. There had been no such injuries for 2003 hires prior to June 12, 2003, the last date for which there is information for that group.

---

[9] Martha Lutenegger testified that employees are instructed to report all injuries, including paper cuts, no matter how trivial. This undercuts the usefulness of "all injuries" as the measure for the effectiveness of the WTS.

[10] Persons hired from 1997 through 2001 could be followed for three years. The numbers for 2002 and 2003 hires are for two years and one year respectively. There were no injuries for individuals hired in 2003 (through September 30).

12

The small number of non-trivial injuries occurring before the implementation of the test would arguably have been insufficient to justify a test with the enormous impact of this one, even if it had reduced injuries. However, taking into account the exposure data, it is clear that the test did not, in fact, reduce injuries at all.

Dr. Campion, EEOC's expert, used the exposure data provided by Dial in response to EEOC's motion for partial summary judgment to examine injury rates for persons hired in each year from 1998 through 2003, examining the rate per full time employee equivalent. This data takes into account the fact that more employees are hired during some years, that they may start at different times during the year, and that they may work for differing amounts of time in the Smokehouse. EEOC Exhibit 38, prepared by Dr. Campion shows that the one strength related workers compensation cost injury suffered by the 1998 hires resulted in an injury rate of 0.09 per full time employee equivalent. (This means that the one injury was compared to 10.91 full time equivalent employees, rather than to the 20 actual people hired during that year.) The 3 such injuries for 1999 hires resulted in an injury rate of 0.14. The 3 such injuries for 2000 hires resulted in an injury rate of 0.05. The 3 such injuries for 2001 hires resulted in an injury rate of 0.16. The one such injury for 2002 hires resulted in an injury rate of 0.06. Thus, the chance of any employee suffering a strength related injury resulting in workers compensation costs if s/he worked full time in the Smokehouse for a fully year ranged from 5% for people hired in 2000 to 16% for people hired in 2001 with 9%, 14% and 6% for hires in the other years. PFF 71. The highest injury rate was, in fact, in 2001, after the test was implemented, although the numbers are far too small for statistical significance.

Dial has not disputed any of the numbers set forth above; indeed they are based on Dial's

numbers.

Dial has made two arguments claiming that the test has reduced injuries and is therefore criterion valid. First, Dr. Jones compared the injuries of persons hired from 1997-1999 with those of hires from 2000-2003. The problem with that grouping is that persons hired in 1997 were far more likely to be injured than persons hired in any year thereafter. Therefore, any grouping of injuries by hire year which includes 1997 will show a dramatic reduction in injuries when compared with any other group that does not include them.

The total number of injuries for 1997 hires during their first three years of employment was 70; more than the 45 injuries for all hires for each of the next *five* years, 1998-2002, combined, during their first three years of employment. The same pattern was apparent in looking at strength related injuries: 1997 hires suffered 48 such injuries during the first three years; the total injuries for all hires from 1998-2002 was 27. When looking at the most relevant type of injuries, strength related workers compensation cost injuries, the numbers are 20 for the 1997 hires and 10 for he next five years combined. The pattern is the same when exposure data is included: 1997 have an injury rate of 0.48 per year; the years from 1998-2002 range from 0.05 to 0.16. Dr. Jones' testimony that injury rates were reduced when 1997 hires were excluded is contradicted by the evidence.

The reason for the dramatic differences in injury rates between 1997 and all hires thereafter is not clear from the record, and Dial introduced no evidence on the subject. It may be that this was simply an aberrant year. Perhaps some of the changes implemented by Dial in order to reduce injuries may have begun to show their effect in 1998. Dial had begun some job rotation among various positions in the Smokehouse in 1996 and had conducted periodic safety

and ergonomic audits, including instituting an additional annual "Back Injury Prevention Program" in 2000. PFF 55. Whatever the explanation, there is no showing that Dial's testing of new employees had any effect on the 1998 and 1999 hires. In fact, the one thing that could *not* have caused the reduction in injury rates after 1997 was the WTS, which was not implemented until 2000.

Dr. Jones also testified that the WTS reduced injuries because women were more likely to be injured than men before the test, Jones, p. 80-84, although he did not include that information in his report or in his testimony on direct examination. Since virtually no men were excluded by the test, any reduction in injury rates caused by the test would have to be the result of a decline in females injury rates. Dr. Jones provided no data to support these assertions, and again this testimony is contradicted by the evidence.

In rebuttal, EEOC's expert, Dr. Campion, looked at the question of whether female employees were more likely to be injured than male employees before the test, since, as discussed above, overall injury rates had not fallen after the test. (Of course, there were far fewer women hired in the 2000-2003 period after the test, and their number of injuries was tiny.) Dr. Campion testified that if male and female injury rates are calculated for each year of hire prior to the WTS, including exposure data, males hired in 1997 had an injury rate of 0.45 per exposure rated, while women had a rate of 0.39. For 1998 the rates were 0.11 for men and 0.5 for women. For 1999 the male rate was 0.19 and the female rate was 0.16. Thus, for two of the three years 1997 and 1999, women actually had a lower injury rate than did men.

Dial challenged Dr. Campion's numbers during cross examination, but presented no contrary evidence. Dr. Campion's baseline numbers of injuries, 40 for 1997 male hires during

15

their first three year and 30 for 1997 female hires during the first three years; 4 male and 2 female for 1998 hires, and 11 male and 5 female for 1999 hires, are confirmed by Joint Exhibit 3 which lists all persons injured in the Smokehouse for 1997-2003 by seniority date and by gender.

The fact that Dr. Jones' testimony with respect to two of his primary conclusions is contradicted by the undisputed injury numbers casts serious questions on all of his expert testimony in the case.

In summary, the WTS has not been shown to have criterion validity. On the contrary, the data shows that people hired after the implementation of the test were not less likely to be injured than those hired without the test, and there is simply no evidence that the WTS contributes toward its purported goal: reducing injuries.

### 4. Dial has Not Met Its Burden of Proof

The Civil Rights Act of 1991 makes clear that an employer who uses a pre-employment test with a discriminatory effect, must prove that the test is job related and consistent with business necessity. The Eighth Circuit has described this burden: "Under the *Griggs* standard, the burden is on the defendant employer to prove both a 'compelling need' for the challenged policy, and the lack of an effective alternative policy that would not produce a similar disparate impact."[11] *Bradley v. Pizzaco of Nebraska, Inc.*, 7 F.3d 795, 797 (8th Cir. 1993); Dial has totally

---

[11] Some courts have arguably placed the burden on the plaintiff of showing that a less discriminatory alternative is available, at least where business necessity is not disputed. *See, Allen v. City of Chicago*, 351 F.3d 306, 311-12 (7th Cir. 2003). In this case the question does not arise, because Dial has not met its undisputed burden of showing job relatednes and business necessity. *Compare, Easley v. Annhauser-Busch, Inc.*, 758 F.2d 251, 255-56 (8th Cir. 1985)(affirming district court finding of disparate impact where the test was not shown to be justified by business necessity and the informal pre-test hiring procedure was available to the company and had not been shown to be unsatisfactory).

failed to show that the WTS is necessary, or even minimally helpful, in achieving its purported goal of reducing injuries. Women successfully performed in the Smokehouse prior to 2000; their injury rates were no different from those of men. After the test, everything remained the same, except that more than half of qualified female applicants were excluded. Because of the test's overwhelming discriminatory impact against women, it violates Title VII, without regard to Dial's intent.

## IV. INJUNCTIVE RELIEF IS APPROPRIATE

EEOC respectfully requests that the Court issue an injunction which includes the following provisions:

- Dial shall not engage in any employment practice which discriminates against women.

- Dial shall immediately cease use of the WTS as a means to exclude potential applicants.

- Dial shall not use any pre-employment selection device which has a disparate impact against women unless such device has been validated, and can be shown to be job related and consistent with business necessity.

- In the event that Dial desires to implement any new pre-employment screening device during the next five years, it shall, at least 90 days before implementing such screening device, provide to EEOC a description of the test, whether it has or is expected to have a disparate impact against women, and all evidence showing its validity.

This is an appropriate case for injunctive relief, because the illegal conduct is ongoing.

"[A] court may exercise its discretion to fashion injunctive relief to remedy the effects of [sex] discrimination." *EEOC v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998), *citing Briscoe v. Fred's Dollar Store*, 24 F.3d 1026, 1028 (8th Cir. 1994); *See also, Sherman v. Kasotakis*, 314 F. Supp.2d 843, 879-80 (N.D. Iowa 2004)(Judge Bennet collects and discusses cases involving various forms of injunctive relief). In this case, the injunctive relief sought is tailored to the violation found. The more general injunctive language in the first section is justified by the jury's verdict of intentional discrimination. The specific provisions prohibiting the WTS and screening device with similar impact are necessary because of Dial's continuing use of the WTS.

### IV. Each of the Class Members is Entitled to Individual Make-Whole Relief

"Prior to the use of the WTS, applicants were selected using a multi-step process including a review of his/her application, a written test, a personal interview, a group problem solving exercise and final interview. Candidates who successfully completed each step of the process were made a job offer contingent on a medical examination and a drug test. After January 1, 2000, the hiring process remained the same, except for the use of the WTS, which was given after the contingent job offer had been made." PFF 8-10. The evidence made clear that each of the women tested first received a contingent job offer, in which she was offered the job, subject to the WTS, a physical exam, and a drug test. [12] Since there is no dispute that each of the 42 class members would have been hired by Dial,[13] but for the WTS, each is entitled to full relief: back-pay, including overtime and

---

[12] There was testimony that some, but not all, of the women were given the physical exam and/or the drug test, even after Ms. Lutenegger had determined that they had failed the WTS. There is no evidence, however, that any of the class members were rejected because of results on either of those tests.

[13] 42 women who were rejected as a result of the WTS were identified as part of the Pre-Trial Order. EEOC has requested Dial to provide the names of any women rejected after

18

benefits, less interim earnings, plus prejudgment interest. Each woman is also entitled to a job offer and front-pay to make up the difference between her earnings at Dial from the date of the job offer to the date at which her pay will equal that which she would have earned had she started on the date authorized in her contingent job offer.

Dial has stated that it intends to argue that some of the class members are not entitled to relief because they would not have been hired even in the absence of discrimination. This argument is refuted by the Stipulated Facts set forth above. All of the class members would have been hired, but for the WTS. In addition, this affirmative defense was not raised in Dial's Answer or in its Statement of Factual Issues or Legal Contentions in the Pre-Trial Order.

The standard for providing back pay was established in *Albemarle Paper Co.*, 422 U.S. at 421: "...given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." In *Easley v. Anheuser-Busch, Inc.*, 758 F. 2d 251 (8th Cir. 1985), the Eighth Circuit considered an employer's affirmative defense that three plaintiffs who had not been hired as a result of a pre-employment test which discriminated against black applicants would not have been hired even without the test. The Court rejected the argument, although acknowledging a problem not applicable here, when there were more class members than there were job openings.[14]

---

November, 2003, whose names were not disclosed during discovery. Dial has not yet complied with Magistrate Judge Walters' Order of September 10, 2004, that those names be produced. Any such individuals should, of course, be part of the class.

[14] Ms. Lutenegger denied the testimony of one unsuccessful female applicant who testified at trial that she recalled being told that she was rejected because there were more qualified males. Dial's testimony at trial was clear that all applicants who passed the test would have been hired.

It noted that the defendant had the burden of proving that any individual would not have been hired, and that it had failed to show that any of the three class members did not "satisfy valid job qualifications." *Id.* at 262. In this case, all of the applicants who were screened using the WTS satisfied the valid job qualifications, other than the discriminatory test, and all of the female applicants rejected because of the test are entitled to full make-whole relief.

## CONCLUSION

For the foregoing reasons, EEOC respectfully requests that the Court: 1) enter judgment on the verdict; 2) enter judgment for EEOC on its disparate impact claim; 3) enter injunctive relief prohibiting the WTS and any pre-employment screening device which has a disparate impact against women and has not been shown to be job related and consistent with business necessity; and 4) award make-whole relief of job offers, back-pay and front-pay to each woman who was rejected because of the WTS.

Respectfully submitted,

_____
Jean P. Kamp

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Milwaukee District Office
310 West Wisconsin Avenue - Suite 800
Milwaukee, WI 53203-2292
(414) 297-1860

Dated: September 23, 2004