FILED
DES MOINES, IOWA

04 SEP 24 PM 4:33

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IA

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 3-02-CV-10109 |
| v. | ) ) ) | Judge Longstaff |
| THE DIAL CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

### DEFENDANT'S MEMORANDUM OF LAW WITH RESPECT TO DISPARATE IMPACT CLAIM

Defendant, The Dial Corporation ("Dial" or "Defendant"), by its attorneys, hereby files this Memorandum of Law with Respect to Disparate Impact Claim.

**I.   THE LAW APPLICABLE TO DISPARATE IMPACT TESTING CLAIMS.**

The disparate impact theory had its origin in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), where the Court held that Title VII prohibited not only overt discrimination but also "practices that are fair in form, but are discriminatory in operation." *Id.* at 431. The Court then set out the standard that defendants must meet to justify a facially neutral practice that has a disparate impact:

> "The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.*



The concept of test validation was then introduced in the case of *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975), in which the Court held that a test that has a disparate impact must be shown "by professionally accepted methods" to be valid – i.e., the test is predictive of, or

significantly correlated with, important elements of work behavior which comprise or are related to the job or jobs for which candidates are being evaluated." *See id.* at 431. In the 1991 Amendments to Title VII Congress codified the *Griggs* standard by providing that if a *prima facie* case of disparate impact is shown, the respondent must "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A). As Dr. Campion testified, in the testing context, this burden is met if the test is shown to be valid (Campion App. A at 8).

Another formulation of the standard, adopted by the Eighth Circuit, is that if a *prima facie* case of disparate impact is established "the employer has the burden to justify the procedure by demonstrating that it is related to safe and efficient job performance and is consistent with business necessity." *Firefighters' Institute for Racial Equality v. City of St. Louis*, 220 F.3d 898, 904 (8th Cir. 2000).

In *Dothard v. Rawlinson*, 433 U.S. 321 (1977), the defendant attempted to defend a minimum height and weight requirement against the charge that it had disparate impact upon women. The defendant contended that the criteria was related to strength but the Court held there was insufficient evidence connecting the height and weight requirements with the requisite amount of strength thought to be essential to job performance. The Court stated that "if the strength requirement is bona fide, the purpose could be achieved by adopting and validating a test for applicants that measured strength directly." *Id.* at 332.

What the Supreme Court endorsed as the means for determining strength is precisely what Dial did in adopting the Work Tolerance Screen (WTS). Dial's experts have shown that that test is valid.

2

CHI 10792282.1

## II. THE WTS IS CONTENT VALID.

Dr. Jackson, who has over 35 years of experience in the area of work physiology, testified that in terms of strength and stamina requirements, the Dial sausage making jobs are as physically demanding as any jobs he has ever seen. Dr. Jones was of the same opinion and documented this fact by the PAQ analysis that showed that, in terms of strength and stamina requirements, the sausage making jobs are in the 90 percentile or higher level when compared to other jobs in American industry. Although initially equivocating, Dr. Campion also had to concede that the jobs were physically demanding (Campion App. B at 13).

There was also unanimity among all three experts that, given the physical demands of the sausage making jobs, there should be a physical ability test given to Dial applicants to ensure that they have the physical capabilities to safely perform the job. As was documented in the PAQ analysis, the sausage making jobs are in the 99th percentile in terms of "Personal Risk of Physical Injury." As Dr. Campion acknowledged, "injuries are more likely to result to the extent that the jobs require physical strength at or above the capabilities of the workers" (Campion App. B at 10-11). Dr. Campion then conceded that the sausage making jobs are "physically demanding enough that it would be reasonable to have a pre-employment screen" (Campion App. B at 16). Thus, the issue is not whether or not the Fort Madison Plant should have a pre-employment physical ability test; it is only whether the test that Dial adopted is valid.

A content valid test does not have to measure all of the elements of the job. As the Uniform Guidelines On Employer Selection provide: "A content validity study should consist of data showing that the contents of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated." 29 C.F.R. § 1607.5(B).

3

Or as Dr. Campion acknowledged, content validity means that the test "assesses the major components of the job" (Campion App. B. at 20).

The evidence is undisputed that the most important aspects of the sausage making jobs are the strength and stamina requirements and, in particular, the requirement that the employees must transport and alternatively lift 35 lbs. to 39" and 69" heights. There is also no dispute that the test requires applicants to transport 35 lbs. and alternative lifts to 33" and 67" heights. Dr. Jackson, who is the expert in physical ability tests, testified that he has never seen a test that is a closer simulation of the physical requirements on the job. The test meets the content validity requirements.

Dr. Campion's initial concern about validity was that no formal job analysis was performed when the test was first implemented (Campion App. A at 22). However, the test is now supported by two detailed job analyses: Dr. Jackson's ergonomic analysis and Dr. Jones' PAQ analysis. Accordingly, the requirement for an underlying job analysis has been met.[1]

Dr. Campion also criticized the test because the applicants were told to work at their own pace which meant that they worked at a pace somewhat faster than the pace on the loading side of the job. However, he had no rebuttal to Dr. Jackson's point that the criticism was irrelevant

---

[1] It is also noteworthy that both Dr. Jackson and Dr. Jones stated that the occupational therapist who regularly worked to rehabilitate injured employees and who developed the test, in fact, performed a job analysis in the sense that she observed the job, made appropriate measurements and developed a test that simulated the job. What was missing was a formal documentation of that analysis. Dr. Campion's only basis for arguing that a more formal job analysis should have been done at the commencement of the test was to provide protection against legal risks (Campion App. B at 29-30). But there is no requirement that an employer hire an expert such as Dr. Campion if there are others qualified to develop the test simply because of the possibility of a legal challenge.

4

because the employees on the job had to work from 5 to 7 hours whereas the test was only 7 minutes, so the test was significantly easier. Also, the distances traveled on the test were less than on the job. In addition, the pace on the unloading side is very close to that of the test. Dr. Campion did not have the expertise to rebut Dr. Jackson's testimony that it is generally recommended by physical ability test experts that applicants should be told to perform at a pace that is comfortable. This ensures that applicants will not overextend themselves and injure themselves while taking the test.

In sum, Dr. Campion presented no specific rebuttal to the evidence presented by Dr. Jackson and Dr. Jones that the test was content valid. In this regard, the Supreme Court has held that if an employer meets its burden of showing that a test is job-related, the burden is on the other party to "show that other tests or selection devices, without a similar undesirable ... effect would also serve the employer's legitimate interest in 'efficient and trustworthy workforce'." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975). The EEOC, through Dr. Campion or otherwise, has not attempted to prove that there is an alternative test that would reduce the adverse impact while still serving the legitimate interest of reducing injuries on the job.

The content validity of the WTS stands essentially unrebutted.

### III.   THE WTS IS CRITERION VALID.

Dial's burden of showing validity is met so long as it demonstrates by any of the recognized validity strategies that the WTS is valid. The Uniform Guidelines state that "for the purpose of satisfying the Guidelines, users may rely on criterion related validity studies, content validity studies or construct validity studies ...." 29 C.F.R. § 1605.5(A) (emphasis added). In

5

CH1 10792282.1

fact, all that Dial need show, in accordance with *Albemarle Paper Co.*, is that the test is shown to be job-related "by professionally accepted methods." As held in *Watson v. Ft. Worth Bank and Trust*, 487 U.S. 977, 998 (1988), "even when defending standardized or objective tests, to introduce formal 'validation' studies 'showing' that the particular criteria predict actual on the job performance" is not required.[2] Dr. Campion also conceded this point (Campion App. B at 20). Accordingly, in light of the essentially unrebutted evidence in support of content validity, Dial is not obligated to also show criterion related validity.

Nonetheless, the evidence is overwhelming that injuries were significantly reduced following introduction of the WTS and, therefore, the test correlates with the objective of the test – reducing injuries. As Dr. Campion recognized, the WTS can be shown to be criterion valid if it is established that it resulted in fewer injuries (Campion App. A at 7-8). The evidence is undisputed that the overall injury rate prior to adoption of the test ranged from 48 to 63 injuries per year and that this declined to a rate of 15 to 27 injuries per year after the WTS.

Dr. Campion's rebuttal to this evidence was a contention that it is significant that the injury rate reduction for non-strength related injuries was somewhat greater than for strength related injuries. Because he hypothesized that the reduction in non-strength related injuries could not be attributed to the WTS, he speculated that the overall decline must be for some other

---

[2] There was also debate at trial as to whether compliance with the Uniform Guidelines is required. The Guidelines are not formal regulation and, therefore, "the fact that an agency or group of agencies has announced the standards they will use does not convert those standards into mandatory legal rules." *Guardians Ass'n. v. Civil Service Comm'n.*, 630 F.2d 791, 91, 110 (2nd Cir. 1980). In fact, the Guidelines were adopted for purposes of evaluating written tests and do not necessarily fit in a physical ability test context. That is why the "professional, accepted methods" endorsed by Dr. Jackson, the physical ability test expert, should be given particular deference.

reason. However, the testimony of both Dr. Jackson and Dr. Jones (as well as common sense) is contrary to the hypothesis. The physical demands of the sausage making jobs will inevitably result in fatigue that, in turn, leads to accidents and non-strength related injuries. Dr. Jackson, who is the expert on work physiology, had no doubt that the WTS would also reduce non-strength related injuries and, ultimately, even Dr. Campion conceded that it is possible that non-strength related injuries could be reduced by the WTS.

Dr. Campion also speculated that perhaps the recording of injury rates was different after the WTS. But this speculation was foreclosed by Martha Lutenegger's testimony that, at all times, it was a disciplinary offense to not report injuries and both she and the safety manager were careful to insure accurate reporting.

Dr. Campion next attempted to prove that, if one looked only at new hires, the reduction in injuries could not be attributed to the WTS. He presented a number of charts setting out data for each year from 1997 to 2003 and speculated that the decline in injuries was primarily the result of the decline between 1997 and 1998. However, all of these charts contained an analytical flaw because they assumed that all the employees worked the entire year. As Dr. Campion admitted, this was wrong because, for example, the 1997 new hires were hired early in the year but the 1998 hires were not hired until October.

This analytical flaw caused Dr. Jones to do an analysis that took account of the actual time each of the new hires served on the sausage making team jobs. This analysis established a reduction of 75-80% in all injuries after introduction of the WTS and a reduction of 80% in workers' compensation injuries. Further, to eliminate any doubt that Dr. Campion's speculation about the 1997 injuries undercut the analysis, Dr. Jones ran the same actual exposure analysis but

7

eliminated the 1997 data and still came up with a decline of 65% in injury rates for new hires after the introduction of the WTS. Dr. Campion did not provide any evidence to show that Dr. Jones' analysis was incorrect.[3]

Accordingly, the evidence of a significant drop in injury rates following the introduction of the WTS stands unrebutted by any analytically sound analysis. The evidence of criterion related validity is overwhelming.

## IV. THE WTS PRODUCED RESULTS REASONABLY EXPECTED IN THE INTEREST OF PROMOTING SAFE PERFORMANCE AND IT WOULD BE UNREASONABLE TO ELIMINATE THE TEST.

As the Eighth Circuit emphasized in the *Firefighters Institute* case, *infra*, it is the employer's burden to establish that the selection procedure is "related to safe and efficient job performance." 220 F.3d at 904. Consistent with this objective, Dr. Jackson went beyond a traditional validity analysis and considered published data (the Snook tables), that Dr. Campion acknowledged "estimate the level of lift that is safe depending on the weights of the lifts and the person's gender and other factors" (Campion App. B at 33).

Because of the extraordinary physical demands and because women on the average have only 50% of the strength of men, it is a fact that cannot be avoided that a much lower percentage of women than men can safely perform the sausage making jobs. As the Snook data shows, for the lifts required in the sausage making jobs, only 10% to 25% of the female population can safely perform those jobs. In this case, approximately 40% of the female applicants passed the

---

[3] Dr. Campion did create one chart of actual exposure rates limited to strength related workers' compensation injuries. However, this chart had such a small sample that it could not be statistically significant. Dr. Campion's failure to attack Dr. Jones' larger statistical samples indicates that he had no basis for rebutting those analyses.

8

WTS so that percentage is greater than would be predicted by the data as to what is safe for female applicants. The extraordinarily physically demanding jobs at the Fort Madison plant present the relatively rare situation that gender parity cannot be expected or required if the objective of promoting safe job performance is to be met.

Gender parity is not always possible in light of inherent differences between men and women in other contexts. Consider, for example, a typing test. Women have on the average greater manual dexterity and more typing experience than men, so any typing test is likely to have a disparate impact upon men. However, one would not expect a legal challenge to such a test because the disparities are predictable in light of acknowledged gender differences. This case is no different because the disparate impact is a result of undisputed differences in strength between men and women.

Dr. Campion has admitted that a physical ability test to screen applicants for the sausage making jobs is appropriate because of the physical requirements. The EEOC has not shown an alternative test, without the disparate impact, that "would also serve the employer's legitimate interests" in a safe working environment. The WTS is valid and there is no basis for eliminating the test.

CHI 10792282.1

## CONCLUSION

Based on the foregoing, Dial respectfully requests that the Court enter judgment in Dial's favor and against the EEOC with respect to the EEOC's disparate impact claim.

Respectfully submitted,

THE DIAL CORPORATION,

By *[signature]*
One of Its Attorneys

Michael A. Warner
Camille A. Olson
Christopher L. Casazza
SEYFARTH SHAW LLP
55 East Monroe Street, Suite 4200
Chicago, Illinois 60603
(312) 346-8000

Kevin J. Driscoll
Thomas J. Joensen
FINLEY, ALT, SMITH, SCHARNBERG,
CRAIG, HILMES & GAFFNEY, P.C.
699 Walnut Street, Suite 1900
Des Moines, Iowa 50309
(515) 288-0145

September 24, 2004