**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION**

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION, )          Civil Action # 3:02-CV-10109
            Plaintiff, )
 )
       v. )          EEOC MEMORANDUM IN
 )          OPPOSITION TO MOTION FOR
THE DIAL CORPORATION, )          JUDGMENT AS A MATTER
 )          OF LAW
            Defendant. )
 )

      Dial has filed a Motion pursuant to F.R.Civ.P 50 for judgment as a matter of law

("JAML") because, it asserts, "the record contains no proof beyond speculation to support the

verdict." Dial Memorandum, p. 8.  Dial has not met the standards for a JAML, because there

was ample evidence from which the jury could find intentional discrimination:  statistical

evidence of discrimination, individual instances of discrimination, and evidence that Dial made

no attempt to correct the disparate impact once it became aware of the situation.   The Motion

should be denied.

      The Supreme Court has recently clarified the standards for review of a verdict under Rule

50 in *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 149-154 (2000):

> the court must draw all reasonable inferences in favor of the non-moving
> party, and it may not make credibility determinations or weigh the evidence.
> [Citations omitted.] Thus, although the court should review the record as a whole,
> it must disregard all evidence favorable to the moving party that the
> jury is not required to believe. [Citation omitted.]

*Id.*, at 150-51. The Court also noted that "the standard for granting summary judgment 'mirrors'

the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Id.*,

at 150, *citing, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-251 (1986).

      In this case, the Court has already denied Dial's motion for summary judgment on

EEOC's pattern or practice claim, the claim decided by the jury and the subject of Dial's motion. *See,* Decision, 7-21-04, attached as Exhibit A.   In so ruling, the Court set forth the types of evidence which were sufficient to permit an inference of intentional discrimination and thus to defeat the motion for summary judgment.  Specifically, the Court noted that:

> [s]tatistics such as these, coupled with specific incidents of discrimination and evidence defendant arguably made no effort to correct the disparate impact once becoming aware of the situation, are sufficient to create a material issue of fact as *to whether* defendant's stated reason for use of the test was pretextual, and whether in fact defendant engaged in a pattern and practice of discrimination.

Decision, p. 20.

There was ample evidence at trial from which the jury could infer intentional discrimination.  The statistical evidence of the disparate impact against women was not disputed. In addition, it was not disputed  that women had been hired at the same rate as they applied for production operator jobs prior to the implementation of the test.  *See,* EEOC Proposed Findings of Fact ("PFF"), ## 11, 12.  The jury saw the score sheets for the work tolerance test, which showed that most of the men tested were graded as "pass" without any comment.  The score sheets for most women, even those who passed, included subjective, negative comments about their performance, despite the fact that the vast majority of women were able to complete the test. When these comments are compared to the relatively few comments on men's score sheets, a jury could infer that women failed the test who performed as well as men who passed the test. *See,* PFF ##39, 40, 41, 42. (Four women marked as passed on the score sheets were nonetheless deemed as failed; men whose "body mechanics" were rated as fair passed, women graded as fair failed; men who were noted as having arched their backs passed, while women failed; men who

2

were observed to go up on their toes passed; women failed.)[1]  There was extensive evidence, which the jury was entitled to credit, that the test did not, in fact, have any effect on performance, and did not reduce injuries.  The jury was permitted to infer, as it did,  that Dial's refusal in light of those facts to reconsider use of the test, or to modify its scoring so as to reduce the disparate impact,  constituted intentional discrimination.

In its Memorandum, Dial argues in effect that its evidence was more persuasive than that described above.[2]  This is not sufficient to meet its burden under Rule 50.  For example, Dial states that the injury rates did, in fact, drop, citing its Proposed Findings of Fact ## 32, 37-43, and 48-52 which are based on the testimony of Dr. Jones, and criticisms of the testimony of Dr. Campion.  Dial Memorandum, p. 2-3.  Most of these facts were disputed.  *See*, EEOC PFF 60-63, 69, 71-74.  The jury was entitled to credit Dr. Campion's testimony, and to reject Dr. Jones'.  Because it did so, Dial's Proposed Findings, to the extent that they are inconsistent with the testimony of Dr. Campion, should not be considered for purposes of this motion.  *Reeves, supra,* 530 U.S. at 151.

Dial disputes the significance of the statistical evidence of disparate treatment.  However, its citation to the Court's summary judgment decision ("As this Court noted in its July 21, 2004

---

[1]  Of course, some of these individuals took the test prior to April, 2001, the date the jury found the pattern and practice to have begun.  This is not inconsistent with defendant's argument, and with instruction #12, that proof of a pattern and practice requires more than isolated, sporadic incidents.

[2]  Dial has not moved for a new trial pursuant to F.RCiv.P. 59, which allows a court to weigh the evidence.  *See, White v. Pence,* 921 F.2d 776 (8th Cir. 1992).  Based on the evidence at trial, particularly that cited in this Memorandum and in EEOC's Brief in Support of Proposed Findings of Fact and Entry of Judgment, EEOC submits that the weight of the evidence supports the verdict; however, that is not the question raised by the instant Motion.

Order regarding the summary judgment motions, Defendant is correct that statistical evidence by itself is insufficient to establish discriminatory intent.")(Dial Memo, p. 3) is incomplete. The Court went on to say, "What defendant fails to recognize, however, is that statistical evidence can *combine* with specific incidents of discrimination to establish the necessary intent. [Emphasis in original.]" Decision, p. 17.

Dial also argues that the jury should have believed the testimony of Martha Lutenegger and Jean Farrington that they did not intend to discriminate against women in implementing the work tolerance test. In fact, it appears that it did credit that testimony in part, in its verdict that the pattern of intentional discrimination began in April, 2001. This verdict is fully consistent with the testimony that the WTS did not have any effect on performance (other than *increasing* the turnover rates) and that persons hired after taking the test were no more likely to be injured than persons hired before the test in 1998 and 1999. Women who had been hired before the test with substantially the same qualifications as women rejected because of the test, were successfully performing the job both before and after the test. Ms. Lutenegger and Ms. Farrington both testified that they were not concerned about the disparate impact on women. The jury was entitled to infer, as it apparently did, that the continued use of the test after April, 2001, was a result of intentional discrimination, whether explicit or based on stereotypical and false ideas of women's ability to perform the job.

Here, Dial has made the same arguments that the Court earlier rejected in denying Dial's motion for summary judgment on the disparate treatment claim. The standards for a JAML are

4

the same.  EEOC respectfully requests that the motion be denied.

Dated this _____ of October, 2004.

Respectfully submitted,

Jean P. Kamp

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Milwaukee District Office
310 West Wisconsin Avenue - Suite 800
Milwaukee, WI 53203-2292
(414) 297-1860

RECEIVED
OCT 1 2 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | CIVIL NO. 3-02-CV-10109 |
| vs. | ) ) | |
| DIAL CORPORATION, | ) | ORDER |
| Defendant. | ) ) | |

The Court has before it cross-motions for partial summary judgment, submitted April 1, 2004, by plaintiff Equal Employment Opportunity Commission ("EEOC") and defendant Dial Corporation ("Dial"). Both motions have been resisted.

In addition, on May 13, 2004, EEOC filed a motion to strike from the summary judgment record portions of the appendix filed by Dial in opposition to EEOC's motion for partial summary judgment. Dial resisted the motion to strike on May 27, 2004, and the EEOC filed a reply on June 4, 2004.

All motions are considered fully submitted.[1]

I.     EEOC's MOTION TO STRIKE

As an initial matter, the EEOC has moved to strike certain exhibits submitted by defendant in support of its opposition to plaintiff's motion for partial summary judgment. Specifically, the EEOC

---

[1] Oral argument has been requested on the motions. After reviewing the extensive pleadings and applicable law, however, the Court deems oral argument unnecessary.

Exhibit  A

FILED 7/21/2004 1:05:52 PM, USDC, Southern District of Iowa

seeks to strike Attachments A and B to Exhibit 1, the Declaration of Joe Linares; Attachment A to

Exhibit 2, the Declaration of Lori Dunn; and Exhibits 1-7 and Appendices B, C, D, and E to Exhibit 3,

the Declarations of David Jones, Ph.D.  The Court will address the various arguments surrounding

these exhibits in turn.

      A.     Attachments A and B to Exhibit 1, the Declaration of Joe Linares

      The EEOC first moves to strike Attachments A and B to Exhibit 1, a declaration by Dial Safety

Director Joe Linares.  According to Mr. Linares, the attachments at issue are a computerized list of all

injuries at Dial for 1997, (Attachment A); and a recently prepared list of all injuries from 1997 through

2003 (Attachment B).

      In support of its motion to strike, the EEOC concedes it does not dispute the authenticity of the

documents, and is not prejudiced by the new information.  It argues, however, that the lists are

inaccurate, and contradictory.  For example, certain injuries alleged listed in Attachment A do not

appear on the Attachment B listing for 1997, and vice versa.  The EEOC also notes that the lists do not

compile OSHA recordable injuries, which generally are more accurately reported than overall injury

data.

      Inaccuracies in a piece of evidence "are relevant to the weight of the evidence, not to its

admissibility." *Mann v. Thalacker*, 246 F.3d 1092, 1100 (8th Cir. 2001) (minor inaccuracies in

victim's statements relevant to weight, not admissibility); *United States v. Reilly*, 33 F.3d 1396, 1409

(3rd Cir. 1994) ("contradictory evidence goes to the weight to be assigned by the trier of fact, and not

to admissibility"); *Transclean Corp. v. Bridgewood Servs. Inc.*, 101 F. Supp. 2d 788, 799 (D. Minn.

2000) (quoting *Reilly*, 33 F.3d at 1409).  Absent a showing of prejudice, the Court finds in the present

case that any alleged inaccuracies or inconsistencies in the attachments at issue may be identified for the jury prior to deliberations.  Counsel for the EEOC may also suggest to the jury that it consider these alleged inaccuracies/inconsistencies in determining the appropriate weight to give the documents at issue.  The EEOC's motion to strike is denied with regard to the attachments to the Declaration of Joe Linares.

B.      Attachment A to Exhibit 2, the Declaration of Lori Dunn

Plaintiff also moves to strike Attachment A to Exhibit 2, the Declaration of Dial Human Resources Specialist Lori Dunn.  In her declaration, Ms. Dunn authenticates Attachment A as a new list of persons tested and/or hired for entry level production positions, in essence replacing prior lists produced in earlier discovery exchanges.  Plaintiff states Attachment A should be stricken based on its lack of reliability, pointing to Ms. Dunn's own admission that: "Throughout this litigation, these sources have not always yielded consistent information . . . ."  Dunn Declaration at ¶ 4.  Dial resists the motion, arguing Attachment A is simply Dial's effort to correct inaccuracies in earlier discovery responses, and to provide the most reliable information available.

Plaintiff's motion to strike this attachment is denied.  As stated above, potential inaccuracies in an exhibit go to the credibility of and weight to be given the exhibit at issue–not to its reliability.  *Mann*, 246 F.3d at 1100.  This is especially true when, as here, the challenged exhibit represents a party's attempt to *correct* relatively minor inaccuracies contained in previously-produced material.

C.      Exhibits and Appendices to David Jones' Declaration

Lastly, the EEOC urges the Court to strike Exhibits 1-7 and Appendices B, C, D and E to Exhibit 3, the declaration of Dial expert witness Dr. David Jones.  The Court will evaluate the

3

admissibility of these exhibits according to the specific objections raised by the EEOC.

    1.    Alleged Lack of Authentication

Exhibits 1 , 2, 4, 5, 6 and 7 to Dr. Jones' declaration are charts created by Dr. Jones

summarizing and interpreting various employee statistics.  Contrary to plaintiff's assertion, the Court

finds the underlying data was in fact authenticated.  In his declaration, Dr. Jones indicates he created the

charts by compiling information from three sources: 1) Dial's Ft. Madison, Iowa hiring information,

which was authenticated in the Declaration of Lori Dunn; 2) Ft. Madison injury statistics, which were

authenticated in the Declaration of Joe Linares; and 3) Ft. Madison payroll records of employees

assigned to the sausage making teams, which are attached as Appendices D and E.   The Court finds

this information "sufficient to support a finding that the matter in question is what its proponent claims."

FED. R. EVID. 901(a) (explaining authentication requirement as condition precedent to admissibility).

Accordingly, the Court finds no reason to strike the above-outlined exhibits based on lack of

appropriate authentication.

    2.    Alleged Inaccuracies

The EEOC next moves to strike exhibits 1-3 and 5-7, as well as Appendices B, C, D and E to

Dr. Jones' declaration on the basis of unreliability and/or inaccuracies.  Such issues go to the weight,

not admissibility of the evidence. *Mann*, 246 F.3d at 1100.  Plaintiff's motion on this basis is therefore,

denied.

    3.    Failure to Produce During Discovery

Plaintiff also moves to strike exhibits 1-4 and 6, as well as Appendices B, C, D and E to  to Dr.

Jones' declaration, based on the fact the information included in the exhibits, payroll data regarding the

sausage making teams, was not provided to the EEOC during discovery.  Defendant resists plaintiff's

motion on this basis, arguing that although the EEOC did request "smokehouse census" information

from Dial covering the years at issue, it has never requested payroll data or information regarding which

employees were working on the sausage making teams at the end of each quarter from 1997 through

2003.  *See* App. to EEOC Reply Memorandum in Support of Motion for Partial Summary Judgment,

Exh. 21, 24-26.

Dial asserts that during discovery, it determined the best means of developing a "team census"

was through seniority lists and weekly crewing sheets and time cards.  Dial asserts it produced all of this

information, absent the time cards, during discovery.  At the time, Dial contends it believed that

reviewing each individual's time card to determine whether he or she worked in the smokehouse during

the relevant time period was too burdensome.

Later, in developing its response to the EEOC's expert witness declaration, Dial claims it

discovered that it *could* provide staffing information through a computerized database.  This

information, compiled in Appendices D and E to Dr. Jones' declaration, was provided to the EEOC in

an effort to supplement the record.

The Court finds Dial's explanation for not producing the computerized data on an earlier date

plausible, and absent evidence of a deliberate attempt to circumvent the discovery rules, declines to

strike the exhibits on this basis.  As set forth above, issues regarding the reliability and accuracy of the

various payroll records is relevant to the weight to be given the exhibits.  Plaintiff's motion to strike

these exhibits is denied.

II.    FACTUAL AND PROCEDURAL BACKGROUND

The following *relevant* facts either are not in dispute or are viewed in a light most favorable to the party opposing the motion for which the particular fact is relevant.

Defendant Dial owns and operates a plant in Ft. Madison, Iowa ("the Plant") that produces a variety of canned meat products.  The majority of Plant employees are represented by the United Food & Commercial Workers' Union, Local 617, and positions assigned to new employees are dictated by the seniority provisions of the collective bargaining agreement.

The entry level jobs in the sausage making area are very physically demanding.  Accordingly, some employees with seniority bid to other positions within the plant, leaving the majority of openings in the sausage making area.

The employees on the Frank-A-Matic, or "loading" end of the sausage making operation must lift and carry rods holding approximately 35 pounds of uncooked sausage links to a moving conveyor apparatus and place or lift the rods onto notches in the conveyor, slowly rotating between the lowest notch at 39 inches and lifting the rods onto the highest notch at either 65 inches (EEOC's contention) or 69 inches (Dial's contention) above floor level.  The employees in the Smokehouse, or "unloading" end of the operation must lift and carry the rods of cooked sausages from the moving conveyor from either a 61 inch or 33 inch height and carry the loaded rods approximately 15 feet to the peeler table.

In January 2000, the Plant implemented a physical ability test, known as the Work Tolerance Screening ("WTS").  Two female employees, Human Resources Manager Jean Farrington, and Martha Lutenegger, an occupational health nurse, conceived of the test to pre-screen for physical ability before placing employees in the entry level sausage making jobs.  The Plant hoped that such a test could help

6

reduce what it perceived to be a high rate of employee injuries attributed to the physically demanding nature of sausage jobs. It also viewed the test as a way of measuring applicants' capabilities in areas of strength, endurance and other physical demands.

Ms. Lutenegger consulted an occupational therapist, Molly Sichterman, at a hospital in Ft. Madison. Ms. Sichterman evaluated the requirements of the sausage making jobs and designed the WTS test. Specifically, the test attempts to simulate lifting a 35 pound rod of sausages, carrying it a distance, and lifting/placing it at alternating "low" and "high" levels to a notched conveyer receiver, followed by unloading the same rod and placing it at a work station.

The employees on the Frank-A-Matic, or loading, end of the operation perform one transport every 1.25 minutes. The employees on the Smokehouse, or unloading, end of the operation, perform one transport every 21.3 seconds. During the WTS, the applicant spends seven minutes continuously carrying a rod with weights totaling 35 pounds back and forth to a plywood frame with notches set at approximately 33 and 67 inches.

The test has at all times been administered by female occupational therapists and Ms. Lutenegger. In the first year, Ms. Lutenegger decided who passed the test; beginning in 2001 the decision was a joint decision of the occupational therapists and Ms. Lutenegger.

According to Dial, applicants are evaluated on their WTS performance based on whether they are able to complete the full seven minutes of the test, and whether they show signs of fatigue or strain which would indicate the applicant could not perform the job duties over a full shift. The EEOC claims, however, that many female applicants who were able to complete the full seven minutes of the test were not hired, and that male applicants who showed signs of fatigue or strain *were* hired.

7

Prior to the use of the WTS, applicants were selected using a multi-step process including a review of his/her application, a written test, a personal interview, a group problem solving exercise and final interview. Candidates who successfully completed each step of the process were made a job offer contingent on a medical examination and a drug test.

After January 1, 2000, the hiring process remained the same, except for the use of the WTS, which was given after the contingent job offer had been made. During the three year period from 1997-1999, before the WTS was implemented, between 52.6% and 54% of new hires in production were male, between 46% and 47.4% were female. In the four years since the test was implemented, 2000-2003, Dial hired 155 entry level production workers. Of these employees, 133 (86%) were male, and 22 (14%) were female.

Since the WTS was implemented, between 158 and 163 males have been tested; 6 (3.69%) have failed. During the same time period, 67 females were tested, and 41 (61.2%) failed. The numbers break down by year as follows:

–In 2000, between 44 and 49 males were tested; two failed and 39 were hired. The parties dispute the number of females who took and passed the test in 2000.

–In 2001, 28 males took the test; two failed and 22 were hired. That same year, 14 women took the test; 11 failed and 3 were hired.

–In 2002, 31 males took the test; 1 failed and 26 were hired. Also that year, 13 women took the test; 12 failed and 1 was hired.

–In 2003, 55 males took the test; 1 failed and 45 or 46 were hired. During the same year, 16 women took the test; 8 failed and 5 were hired.

Most female applicants who took the WTS completed the test. Nevertheless, the pass rate for female test takers has been less than 80% of the pass rate for male test takers in each of the four years

(2000-2003), as well as for the four years combined. Evaluated by another measure, the pass rate for female test takers has been less than the pass rate for male test takers to a statistically significant degree in each of the four years (from 4 to 6 standard deviations for each year from 2000-2003) and for the four years combined (more than 8 standard deviations).

Specifically, on March 9, 2000, Paula Liles took the WTS. She was able to complete the seven minute test, lifting and carrying 35 pounds to alternating heights of 35" and 65." Ms. Lutenegger nevertheless determined Ms. Liles had failed the test, and Dial did not to hire her.

Also on March 9, 2000, Charlotte McClure took the WTS. She was able to lift with adequate strength, despite increased difficulty lifting over her head because of her height, 5'. Ms. Lutenegger decided, based on the scoring sheet, that Ms. McClure had failed the test, and Dial did not hire her.

On March 11, 2000, Tracy Dresden took the WTS. Her scoring form noted " . . . She does display the strength and endurance for continuous lifting." Exh. 10, Bates #100188. Ms. Lutenegger judged Ms. Dresden to have failed the test, and Dial did not hire her.

On October 28, 2002, Caleb Land took the WTS. The scoring sheet indicated Mr. Land's "rate slowed down during the course of exercise and was breathing heavier." Exh. 10, Bates ## 0069-0070. Ms. Lutenegger decided he passed the test.

On November 5, 2002, Bryan Grafton took the WTS. The scoring sheet indicated Mr. Land had a "slightly arched back when lifting to 65 ½ inches," and that he "became slightly fatigued." Exh. 10, Bates # Def. 0093. Ms. Lutenegger decided he passed the test.

On April 29, 2003, Blain Martin took the WTS. The scoring sheet indicated Mr. Martin showed: "Perspiration, face flushed Stated just started B/P medicine 2 wks. ago" and "Very Nervous

9

Shaky." Exh. 10, Bates ## Def. 3132-33. Ms. Lutenegger decided he passed the test.

Kenneth Hogan took the WTS on October 28, 2002. He was deemed to have failed. He took the test again on May 27, 2003, and was judged to have passed by Ms. Lutenegger.

Dial did not consider the Uniform Guidelines on Employee Selection Procedures prior to implementing the WTS, which require an employer to validate selection procedures that may cause a disparate impact. Furthermore, although Dial has been aware of the alleged disparate impact of the test since late 2000, it has not made or even considered making changes to reduce the adverse impact of the test.

In addition to the WTS, the Plant has considered and implemented a number of measures in an effort to reduce the injury rate, including: (1) implementing a Plant ergonomics program; (2) implementing a rotation system between the unloaders and peeler operators; (3) providing lifting education and instruction; (4) discussing means for reducing injuries in sausage making teem meetings; (5) instituting an exercise program; (6) adapting a work hardening program before requiring employees to work a full day on sausage making teams; (7) providing protective back belts to employees; (8) showing employees back injury prevention videos; and (9) implementing incentive plans to promote safety (such as free meals for injury free work hours). The parties dispute whether the above measures were considered and/or implemented before introduction of the WTS, however, and whether, despite these efforts, injury rates continued to rise.

Before the WTS was implemented, 13 sausage making employees at the Plant suffered injuries resulting in workers compensation costs in 1998; 20 such injuries were reported in 1999. In the first three years after implementation of the WTS, 9 workers suffered injuries resulting in workers

10

compensation costs in 2000; 11 in 2001 and 11 in 2002.

Prior to the WTS, there were 17 OSHA-recordable injuries in the sausage making department in 1998, and 16 in 1999. Following implementation of the WTS, there were 10 OSHA-recordable injuries in the sausage making department in 2000; 10 in 2001; 8 in 2002; and 8 from January 1, 2003 through June 12, 2003.

After being turned down for employment with defendant based on her WTS score, Paula Liles filed a charge of gender discrimination with the EEOC. Based on this charge, on September 24, 2002, the EEOC filed the present action on behalf of Ms. Liles and a class of female applicants for employment, alleging defendant's use of the WTS amounts to unlawful discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. Specifically, in paragraph 7 of its complaint, the EEOC alleges first that Dial's use of the WTS has resulted in a "significant disparate impact against women, which has not been shown to be job related for the position of production worker, nor consistent with business necessity." Complaint at ¶ 7. In addition to its disparate impact claim, the EEOC also sets forth a claim for intentional gender discrimination, or disparate *treatment*. *Id.*

In its present motion for partial summary judgment, the EEOC alleges no material fact exists as to whether it can establish its disparate impact claim, and urges the Court to enjoin further use of the WTS as a pre-employment screening device. Dial has resisted this motion, and filed a cross-motion for summary judgment on plaintiff's disparate treatment claim.

III.    APPLICABLE LAW AND DISCUSSION

A.    Summary Judgment Standard

Summary judgment is properly granted when the record, viewed in the light most favorable to

the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Walsh v. United States*, 31 F.3d 696,

698 (8th Cir. 1994). The moving party must establish its right to judgment with such clarity that there is

no room for controversy. *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir. 1982). "[T]he mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

*fact*." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue is "genuine," if the

evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at

248. "As to materiality, the substantive law will identify which facts are material.... Factual disputes

that are irrelevant or unnecessary will not be counted." *Id.*

"Summary judgment should seldom be used in employment discrimination cases." *Crawford v.*

*Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994). Summary judgment should be granted only on the rare

occasion where no dispute of fact exists and there is only one conclusion. *Id.* (citations omitted)

(quotations omitted). The Court should not grant defendants' summary judgment motion "unless the

evidence could not support any reasonable inference for the nonmovant." *Id.* (citations omitted).

B.    EEOC's Motion For Summary Judgment on Disparate Impact Claim

As set forth above, paragraph 7 of the EEOC's complaint alleges that defendant's use of the

WTS has resulted in a "significant disparate impact against women." Complaint at ¶ 7. "Title VII

12

prohibits employment practices that may be 'fair in form' or facially neutral but that are 'discriminatory in operation.'" *Kraul v. Iowa Methodist Medical Ctr.*, 95 F.3d 674, 681 (8th Cir. 1996) (quoting *Connecticut v. Teal*, 457 U.S. 440 (1982) (additional internal citation omitted)).  To establish a prima facie case of disparate impact, a plaintiff must show the defendant's use of a facially neutral employment practice "falls more harshly on one protected class than another, without justification.  *Id.* (citing *Houghton v. SIPCO, Inc.*, 38 F.3d 953, 958 (8th Cir. 1994)).  Specifically, a plaintiff must produce "'statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion' of benefits because the beneficiaries would be women."  *Id.* (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988)).

For purposes of plaintiff's motion, defendant does not dispute that its use of the WTS as a pre-employment screening tool has resulted in a decrease in the percentage of women hired for production positions.  In fact, the percentage of new production hires that were women dropped from between 46.2% and 47% before use of the WTS to 14% after the test's implementation.  *See* Plaintiff's Statement of Undisputed Facts at ¶¶ 6, 11, and Defendant's Response thereto.  The burden then shifts to defendant to demonstrate the practice is "related to safe and efficient job performance and is consistent with business necessity."  *See, e.g., Firefighter's Inst. v. City of St. Louis*, 220 F.3d 898, 904 (8th Cir. 2000); *see also* 42 U.S.C. § 2000e-2(k)(i).[2]

Dial attempts to meet this burden by arguing that the test in question was designed to simulate

---

[2]  Assuming defendant was able meet this burden, plaintiff could still prevail on its claim by showing an alternative job selection method exists that has "substantial validity and a less disparate impact."  *Id.* Because material issues of fact exist with regard to the test's validity, the Court need not reach this issue at this juncture.

the actual tasks of employees who work on the sausage team, and is necessary both to reduce the

number of injuries in the sausage making operation, and to more accurately measure applicants'

physical capabilities to safely perform these tasks.   Specifically, Dial points to the opinion of its expert

witness indicating that physical strength and endurance are the most critical job requirement for a

production worker in the sausage department, *see, e.g.,* Jones Declaration at ¶ 3.  Dr. Jones also states

that other employers with similar jobs use such tools to identify which individuals will be able to meet

the physical demands of the job "without experiencing fatigue, strain and poor body mechanics that

contribute to a higher likelihood of injury."  *Id.* at ¶ 8.  Both of these factors suggest the test is "content

valid."[8]

 The EEOC's expert, Michael Campion, Ph.D., disputes that the test is content valid.  Among

his concerns is the lack of evidence that the test accurately simulates such job functions as pace, lifting

height and difficulty of lift.  EEOC Expert Report at 22.  He also raises the concern that the WTS only

applies to jobs a new hire holds for an average of 11 months.  *Id.*

 In its reply memorandum, the EEOC further challenges Dial's content-validity argument by

noting that the new data relied upon by Dial's expert, David Jones, Ph.D., reveals that some new hires

did not even work in sausage production, and that many of those that are placed in the department do

not remain there for more than 6 months.  *See* Jones Declaration at ¶ 46; App. E to Jones Declaration

---

 [3] An employment screening tool may be validated by showing content validity, or criterion-related validity.  *See, e.g.,* EEOC Expert Report of Michael Campion, Ph.D., at 14, 23.  According to Dr. Campion, content validity "demonstrates job-relatedness by showing that the selection process is a sample or simulation of an important component of the job." EEOC Expert Report at 14.  Criterion-related validity demonstrates a statistical relationship between test performance and specific job performance.  *Id.* at 23. "In the context of a physical ability test [like the WTS], the criterion is often injuries rather than job performance."  *Id.*

(of fifteen individuals hired on May 1, 2000, 6 worked less than 1000 hours during first year in the sausage department). The record shows that 155 individuals were hired by Dial between 2000 and 2003. Plaintiff's Exh. 5. The fact 6 of those workers may not have worked more than 6 months in sausage making does not prove as a matter of law that the WTS is not an accurate simulation of the job to be performed by a vast majority of new hires.

The parties also disagree as to whether the test demonstrates criterion-related validity, the reduction in departmental injuries. The EEOC expert, Dr. Campion, concedes that "the total number of yearly injuries dropped by more than half in 2000-2002 compared to 1998-1999." EEOC Expert Report at 24. He then contends, however, that because the decrease in "non-strength-related injuries" is larger than the drop in "strength-related injuries," it is inappropriate to attribute the drop in overall injuries solely to the implementation of the WTS. *Id.* at 26. For example, the decrease could have been caused by a change in the method for recording injuries. *Id.* He also notes that there is no statistically significant reduction in overall OSHA-recordable injuries, and that the rates of injury for new employees before and after the test are virtually the same. *Id.* at 29-32.

Dial's experts, Dr. Jones and Andrew Jackson, P.E.D., dispute Dr. Campion's findings, arguing that Dr. Campion's opinions are based on very small sample sizes. *See, e.g.,* Jones Declaration at ¶¶ 12. Dr. Jones also notes that in attempting to evaluate injury rates, Dr. Campion tracks new hires over a very short period of time. *Id.*

Significantly, neither party has asserted a *Daubert* challenge seeking to strike proposed testimony for lack of 1) scientific knowledge; or 2) overall assistance to the trier of fact. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 588-93 (1993) (interpreting

15

Federal Rule of Evidence 702).  Absent such a challenge, it is not for this Court to evaluate competing

methodologies of expert witnesses.  Assuming the reduction in injury in fact remains as Dial's primary

reason, *i.e.*, its *business necessity*,  for both adopting and maintaining the test, the success of the

EEOC's claim undoubtedly will turn on the persuasiveness of the competing expert witness reports, and

the accuracy of the data underlying the reports.  The Court therefore concludes that material issues of

fact exist as to whether Dial can show its use of the WTS is "related to safe and efficient job

performance and is consistent with business necessity." *Firefighter's Inst.*, 220 F.3d at 904.  The

EEOC's motion for summary judgment on its disparate impact claim is denied.[4]

      C.      Dial's Motion for Summary Judgment on Disparate Treatment Claim

     In addition to its disparate impact claim, the EEOC also has alleged a claim for disparate

treatment discrimination.  *See* Complaint at ¶ 7 ("Dial has intentionally discriminated against Liles and

other female applicants by refusing to hire them because of their sex.").  In its motion for partial

summary judgment, Dial argues that although material issues of fact exist with regard to plaintiff's

disparate *impact* claim, the Court should find as a matter of law that plaintiff is unable to establish a

claim of disparate *treatment*, or *intentional* discrimination.  Specifically, defendant contends that other

than statistical evidence, plaintiff has no evidence of pretext, or discriminatory motivation behind the use

_____

    [4]  In its reply memorandum, the EEOC also notes that new data produced in conjunction with Dr.
Jones' expert report indicates that individuals hired to work in the sausage department during the summer
of 2001 were not given the WTS and did not experience a high rate of injuries, seriously undermines the
job-relatedness and overall business necessity of the test.  *See* App. E to Jones Declaration (indicating
several employees hired during the summer of 2001 for work in the sausage department were not tested).
Whether the number of individuals involved is sufficient to undermine Dial's remaining data is for the
factfinder, however.

of its test, which is crucial to its claim.[5]  *See, e.g., International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1997) ("Proof of discriminatory motive is critical" in claims of disparate treatment discrimination).

Defendant is correct that statistical evidence by itself is insufficient to establish discriminatory intent.  *See, e.g., McDonnell Douglas Corp.*, 411 U.S. 792, 805 n.19 (1973) (although statistics are relevant in evaluating whether refusal to hire is part of pattern or practice of discrimination, statistics themselves are not controlling); *Kesler v. BASF Corp.*, 240 F. Supp. 2d 956, 961 (S.D. Iowa 2002) (statistics alone do not establish motive in disparate treatment case).  What defendant fails to recognize, however, is that statistical evidence can *combine* with specific incidents of discrimination to establish the necessary intent.

For example, the test scoring sheets show that the vast majority of test takers were able to *complete* the test, which is a relatively objective criterion.  *See, gen.* Plaintiff's Exh. 10.  Nevertheless, Ms. Lutenegger and/or the occupational therapy assistant who administered the test wrote comments on virtually all of the women applicants' score sheets, and used these comments to disqualify the vast majority of female applicants.  *See id.*  In contrast, the majority of the male applicants were passed with little or no comment, and those that received comments were treated more favorably than women.  For example, the comments on the test form of Paula Liles indicated: "Although worker had increased

---

[5]  To establish a prima facie case of discrimination in a traditional failure to hire context involving one or a small group of plaintiffs, a plaintiff must show: 1) membership in a protected class; 2) the individual(s) was otherwise qualified for the position; 3) the individual was not hired; and 4) a person outside the protected class was hired.  *See, e.g., Chambers v. Metropolitan Prop. & Casualty Ins. Co.*, 351 F.3d 848, 856 (8th Cir. 2003) (age discrimination); *Kobrin v. University of Minnesota*, 34 F.3d 698, 701 (8th Cir. 1994) (gender discrimination).  Because plaintiff has filed the present action on behalf of a class of female applicants, however, the Court has followed the pattern and practice mode of analysis.

17

difficulty, she was able to lift up to 65" safely with increased energy expenditure and effort. Lifting up over her head was difficult due to her height." Exh. 10, Bates # 100191. Despite objectively passing the test, however, based on the comments, Ms. Lutenegger *subjectively* decided not to hire her. *Id.* Similar comments were made on the score sheets of other women applicants, with a negative interpretation from Ms. Lutenegger. *See, e.g., id.*, Bates # 100194 (score sheet for Charlotte McClure indicated Ms. McClure able to lift safely "with adequate strength," but experienced increased difficulty lifting over her head due to her relatively small stature); *Id.*, Bates #100188 (score sheet for Tracy Dresden indicated "She does display the strength and endurance for continuous lifting," yet Ms. Dresden was determined to have failed the test).

In contrast, several male applicants whose score sheets indicated evidence of fatigue or heavy breathing ultimately were given a "pass" by Ms. Lutenegger. *See, e.g., id.*, Bates # Def. 69-70 (score sheet for Caleb Land indicated his "rate slowed down during the course of exercise and was breathing heavier"); *Id.*, Bates # Def. 0093 (Bryan Grafton score sheet indicated "slightly arched back when lifting to 65 ½ inches" and "became slightly fatigued," yet Mr. Land was hired); *Id.*, Bates # Def. 3132-3133 (Blain Martin score sheet stated: "perspiration, face flushed. Stated just started B/P medicine 2 wks ago" and "Very Nervous Shaky").[6]

Contrary to Dial's argument, the fact that the individual who developed the WTS, as well as Ms. Lutenegger, the decisionmaker, were themselves female does not nullify discriminatory intent as a

---

[6]  The Court notes the test score sheets themselves do not indicate whether the particular individual at issue ultimately was hired. In responding to plaintiff's statement of additional facts, however, defendant does not dispute plaintiff's representation as to whether Ms. Lutenegger recommended the individual be hired.

18

matter of law. *Cf Richter v. Hood SupeRX, Inc.*, 142 F.3d 1024, 1032 (7th Cir. 1998) (*"While not dispositive*, this Court has found it significant that individuals alleged to have discriminated on the basis of age were themselves members of the protected class.") (emphasis added).  As noted by the EEOC, it is not necessary to prove a particular "animus" or "malice" towards women in order to prove disparate treatment.  *See, e.g., E.E.O.C. v. Joes' Stone Crab, Inc.*, 220 F.3d 1263, 1283-84 (11th Cir. 2000).  It is for the factfinder to determine whether the decisions with regard to these particular applicants were based on sound business judgment or whether the subjective score sheet comments and interpretation thereof evidence a pattern and practice of discriminatory intent.

In its reply memorandum, defendant cites to *E.E.O.C. v. McDonnell Douglas Corp.*, 191 F.3d 948, 951 (8th Cir. 1999) for the premise that isolated incidents cannot serve as the basis for a claim of pattern and practice discrimination.  As explained by the court:

> To establish a *prima facie* case of pattern-or-practice discrimination, a plaintiff must prove that the employer 'regularly and purposely,' *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 (1977), treated members of the protected group less favorably and that unlawful discrimination was the employer's "regular procedure or policy," *id.* at 360.  "Proving isolated or sporadic discriminatory acts by the employer is insufficient . . . rather it must be established by a preponderance of the evidence that . . . 'discrimination was the company's standard operating procedure–the regular rather than the unusual practice.'" *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 875-76 (1984) (quoting *Teamsters*, 431 U.S. at 336).

Significantly, however, in *E.E.O.C. v. McDonnell Douglas Corp.*, both the lower court and the Eighth Circuit found a lack of credible statistical evidence showing a "significant" change in the number of older workers "before and after" the allegedly discriminatory event.  *Id.* at 952.  The court therefore was left with only anecdotal evidence, which it found to be insufficient to establish a pattern or

practice of discrimination. *Id.* at 952-53.

The statistical evidence in the present case can hardly be considered "insignificant." The evidence shows the hiring rate for women went from between 52.6% and 54% before the WTS was implemented, to 14% after implementation. *See* Plaintiff's Statement of Undisputed Facts at ¶¶ 6, 11, and Defendant's Response thereto. Statistics such as these, coupled with evidence of specific incidents of discrimination and evidence defendant arguably made no effort to correct the disparate impact once becoming aware of the situation, are sufficient to create a material issue of fact as to whether defendant's stated reason for use of the test was pretextual, and whether in fact defendant engaged in a pattern and practice of intentional discrimination.

IV.   CONCLUSION

For the reasons outlined above, the EEOC's motion to strike certain exhibits and appendices is denied in its entirety. The EEOC's motion for partial summary judgment on its disparate impact claim is denied. Defendant Dial Corporation's motion for partial summary judgment on plaintiff's disparate treatment claim also is denied.

IT IS ORDERED.

Dated this 21st day of July, 2004.

RONALD E. LONGSTAFF, Chief Judge
United States District Court

20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION,                           )
                                      )
                Plaintiff,            )        Civil Action No. 3-02-10109
        v.                            )
                                      )
THE DIAL CORPORATION,                 )        **CERTIFICATE OF SERVICE**
                                      )
                Defendant.            )
_____ )

I, Joanne Murray, hereby certify that on September 23, 2004, I caused the following

documents to be served upon the defendant's attorneys, Michael A. Warner, Esq. Seyfarth Shaw, 55

East Monroe Street - Suite 4200, Chicago, IL 60603-5803 by first class mail.

1.      EEOC's Memorandum in Opposition to Motion for Judgment as a Matter of Law;
        and

2.      Certificate of Service.


_____
Joanne Murray, Legal Clerk
EQUAL EMPLOYMENT OPPORTUNITY
            COMMISSION
Milwaukee District Office
310 West Wisconsin Avenue - Suite 800
Milwaukee, WI  53203-2292